McCook Irrigation & Water Power Co. v. Burtless.

*Grant G. Martin, Attorney General, Frank E. Edgerton* and *J. B. Strode,* for appellant.

*T. S. Allen* and *E. G. Maggi, contra.*

---

McCOOK IRRIGATION & WATER POWER COMPANY, APPEL-LEE, V. PAULINE BURTLESS ET AL., APPELLANTS.

FILED APRIL 3, 1915.   No. 18965.

1. **Waters: IRRIGATION COMPANY: REGULATION OF RATES.** An irrigation company is a common carrier of water to a limited degree, and its rates and charges are subject to regulation and control.

2. ———: ———: ———: JURISDICTION: STATE RAILWAY COMMISSION. Jurisdiction to inquire into the reasonableness of water rates and to regulate and fix the same has by the constitution and statutes been conferred upon the state railway commission.

3. ———: ———: ———. Contracts between an irrigation company and water users under its ditch, providing for the use of water and for the maintenance of the ditch, are entered into with the law as to the right of the state to regulate rates forming a part of the contract, and such rates are subject to control.

4. ———: STATE RAILWAY COMMISSION: JURISDICTION. The railway commission is not vested with jurisdiction to settle disputed property rights as to the ownership of an irrigation canal.

APPEAL from the State Railway Commission. *Affirmed.*

*W. S. Morlan,* for appellants.

*C. E. Eldred,* contra.

LETTON, J.

A complaint was filed by the McCook Irrigation & Water Power Company before the state railway commission against 18 holders of water-right contracts under its canal, setting forth that the annual maintenance fee due from water-right holders to the company under the contracts was $1 an acre per annum; that complainant has not sufficient income therefrom to enable it to keep up and properly maintain the canal; that an increased charge is necessary and that a charge of $2 an acre would be a reasonable rate, which it is entitled to receive. The prayer is that a hearing may be had and complainant be authorized to charge consumers an annual maintenance fee of $2 an acre, to be made to apply for water furnished for the year 1913.

The respondents filed an answer denying the jurisdiction of the railway commission of the subject-matter of the complaint, which it is said is within the jurisdiction of the courts. The answer also pleads the failure of complainant to furnish sufficient water in the irrigation season of 1913; that it carelessly and negligently allowed the canal to become filled with weeds and debris, and to be obstructed, so that it failed to carry the amount of water to which the respondents' lands were entitled. It also pleads a number of acts of misconduct on the part of certain directors of the corporation whereby it is alleged they obtained special privileges and advantages, and charges general mismanagement.

A hearing was had, and an order made allowing the complainant to increase its maintenance charges to $2 an acre per annum. The company was also required to set apart each year $4,500 for the operation, maintenance and betterment of the ditch and to place any unexpended portion of this amount in a reserve fund for use in emergen-

cies. It was also ordered that a new set of books be opened containing certain specified entries, and that a daily record be kept during the irrigation season of the flow in the main canal and the distribution of water to the users. From this order respondents have appealed.

The principal contention of respondents is that the commission has no authority to make an order releasing complainant from the provisions of the contracts; that the order deprives the defendants of their property without due process of law, and impairs the obligation of their contracts contrary to the provisions of the Constitution of Nebraska, the Constitution of the United States, and of the fourteenth amendment thereof. It is also said that the order is not supported by the evidence, and that under the covenants in the water deeds the title to the canal was and should be in its customers, since the whole amount of available water rights had been sold. These contentions will be considered in different order than presented.

1. The evidence conclusively shows that the rate of $1 an acre per annum is insufficient to maintain the canal, even after deducting certain charges criticised by the respondents, and that unless the complainant is allowed to increase the rate it will be impossible to maintain the canal in a condition so that it will deliver water. The computations made by respondents and set forth in the reply brief, showing that the income is more than sufficient to meet expenses, are not accurate, since they include hundreds of dollars received from the sale of water rights. Such sums are no part of maintenance charges. The plan of the corporation, expressed in its deeds or contracts with holders of water rights, provides that, when the water rights to the capacity of the canal have been sold and paid for, the canal becomes, by certain acts of its officers therein specified, the property of the water-right holders. Under such provision the money paid for a water right represents *pro tanto* a portion of the capital of the corporation. When the rights have all been sold the title to the canal passes, but the title to the money remains in the corporation. It may not therefore be taken from the

corporation without its consent to be used for maintenance. This is said, assuming, of course, that the prices paid have been fair and reasonable and not padded to such an extent that it is seen that at least a portion of the cost of maintenance should be met from the excess charge. In this case, however, no such condition appears as to any of the respondents. Under the order made by the railway commission complainant is not allowed to squander or dissipate any sum realized from the increase in rates in excess of that actually expended each year for the maintenance of the ditch. Its books are subject to inspection, and if it should prove when further repairs have been made to the canal, or a more specific and detailed system of bookkeeping used, that the rate now fixed is excessive, it can be reduced upon proper application being made to that body.

2. It is strongly insisted that the evidence shows that all the available water which could be furnished has been disposed of under existing water-right contracts; that for that reason the consumers own the canal, and the complainant as a stock corporation has no interest in the property. This question involves the ownership of the property, and is one which the railway commission has no jurisdiction to hear or determine. If the facts warrant, proper relief may be afforded by appropriate proceedings in a court of equity.

3. Respondents insist that if the existing rate is unsatisfactory to the company it cannot complain because it was competent, and under no restriction, when it fixed the rate, and that regulation can only apply on the complaint of waters users when they show the agreed rate is unreasonable. This involves the constitutional questions raised.

The crucial question is whether the rate of $1 an acre a year fixed in the contract is a property right with which the state in the exercise of its regulatory power cannot interfere. At the time the canal was built the practice of irrigation in this state was in its infancy, but from the very first the legislature recognized the public interest in the use of water from the streams of the state for irriga-

tion purposes. It placed canal companies in the same class as railways and other common carriers, and it has uniformly been considered that their rates were subject to regulation and control. *Cummings v. Hyatt*, 54 Neb. 35; *Castle Rock Irrigation, Canal & Water Power Co. v. Jurisch*, 67 Neb. 377; *Farmers Canal Co. v. Frank*, 72 Neb. 136; *Fenton v. Tri-State Land Co.*, 89 Neb. 479, 492. At first no tribunal was provided which had the power to fix and establish rates, and the only remedy the consumer had was to apply to the courts to restrain unjust exactions or unreasonable charges, but afterwards by constitutional amendment and statute the state railway commission was vested with full power and authority to regulate and fix rates and charges, so that they would be fair and equitable both to the consumer and to the corporation supplying the water. Const., art. V, sec. 19a; Rev. St. 1913, secs. 3382-3384.

The question involved is an important one, and one as to which there has been some difference of opinion; but we believe the larger and broader view, that most consistent with the spirit in which the law of irrigation should be administered, and that to which courts are more and more tending, is that any contracts entered into between the irrigation company and consumers under the ditch, with reference to the annual rates which should be charged for the use of water, were entered into with the law forming a part of the contract, and were subject to legislative control. *Tampa Water Works Co. v. Tampa*, 199 U. S. 241, 26 Sup. Ct. Rep. 23; *Spring Valley Water Works Co., v. Schottler*, 110 U. S. 347, 4 Sup. Ct. Rep. 48; *City of Manitowoc v. Manitowoc & Northern Traction Co.*, 145 Wis. 13; *Stanislaus County v. San Joaquin & King's River Canal & Irrigation Co.*, 192 U. S. 201, 24 Sup. Ct. Rep. 241; *White v. Farmers Highline Canal & Reservoir Co.*, 22 Colo. 191. An interesting discussion of this topic with cases cited may be found in 2 Wiel, Water Rights in the Western States (3d ed.) secs. 1315-1321.

If the canal company cannot receive sufficient money to keep the canal intact, the water supply must fail. The

98Neb.10

consumers will be direct sufferers from such a condition of affairs, but the state, which has granted the franchise to cross the lands of others and has allowed the appropriation of public waters for the advancement of agriculture and the building up of prosperous agricultural communities, would also be injuriously affected by the failure of the enterprise. It is also worthy of consideration that, if these contract holders are entitled to be supplied at the rate of $1 an acre, subsequent purchasers of water rights, if any, may be compelled to pay excessive rates in order to provide the necessary funds for maintenance. If the company should attempt to exact such rates, the question might arise whether such discriminatory charges could be upheld.

*Osborne v. San Diego Land & Town Co.*, 178 U. S. 22, 20 Sup. Ct. Rep. 860, was a case brought by an irrigation company to settle the question whether it had authority to increase its water rates. The case was tried in the United States circuit court and appealed to the supreme court of the United States. The contract provided that the annual rate should be fixed by the company "as allowed by law." The company had for many years collected $3.50 an acre, and was now seeking to raise the rate to $7. The defendants claimed that the $3.50 rate had been fixed by contract, under the provisions of a statute which provided that, until the rates "shall have been abrogated by such board of supervisors, as in this act provided, the actual rates established and collected by each of the persons, companies, associations and corporations now furnishing, or that shall hereinafter furnish, appropriated waters for sale, rental or distribution to the inhabitants of any of the counties of this state, shall be deemed and accepted as the legally established rates thereof." The circuit court held that the question whether an increase to the proposed rate of $7 an acre was reasonable was not open to its decision, and that resort must first be had to the board of supervisors of San Diego county, the only body with power to fix rates. The supreme court affirmed this decree. In the opinion, speaking of the claim that the contract rates thus estab-

McCook Irrigation & Water Power Co. v. Burtless.

lished could not be altered at the desire of the company, that they were property rights, and to change them would be violative of constitutional rights, the court said: "The purpose of the act rejects such view. Its purpose is regulation, deliberate and judicial and periodical regulation by a selected tribunal, and we cannot believe that the legislature intends by an absolute and peremptory provision to fix rates upon the water companies unalterable by them, no matter what change in conditions might supervene. Against rates which may become unreasonably high, the statute gives relief to consumers through petition to the board of supervisors. Rates which may become unreasonably low it surely does not intend to impose on the companies forever, except as relief may come from the voluntary justice of its customers or by a violation of the statute and appeal to the courts."

We are aware that there are cases, in which the point was not directly involved, which seem to indicate that if the question were before it the court would have taken a contrary view to that taken here, but there are at least an equal number of cases, better reasoned, as we view the matter, holding practically in conformity herewith.

Holding the view that the contracts were entered into subject to the right of the state in the exercise of its police power to regulate and fix reasonable rates to be charged for the use of the water, the order of the railway commission does not take property without due process of law, and is not in violation of the Constitution of the United States, the fourteenth amendment, or the Constitution of the state of Nebraska.

Many complaints of mismanagement and of undue preferences in the sale of water rights and of other irregularities are made. For these a remedy exists in equity, and the railway commission is not vested with the power to settle and adjust the property rights involved.

The order of the commissioners is reasonable, and is

AFFIRMED.

ROSE and SEDGWICK, JJ., not sitting.