STATE, EX REL. HORACE CARY ET AL., APPELLANTS, V. R. L.
COCHRAN ET AL., APPELLEES.

292 N. W. 239

FILED MAY 24, 1940. No. 30774.

*King & Haggart, Cleary, Suhr & Davis* and *Hamer, Worlock, Randall & Tye,* for appellants.

*Walter R. Johnson, Attorney General, Bert L. Overcash, John L. Riddell* and *Rush C. Clarke, contra.*

*T. M. Morrow* and *T. F. Neighbors, amici curiæ.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

CARTER, J.

This is an action of mandamus brought by a number of irrigators under the Kearney canal, on behalf of themselves and others similarly situated, and by the Central Power Company, which, with the exception of one small user of water, is the owner of the oldest water appropriation on the Platte river and its tributaries. The respondents are the

governor, the state engineer, and the chief of the bureau of irrigation and his subordinates. The petition prays for the issuance of a writ of mandamus compelling the proper administration and enforcement of the irrigation laws of the state for the purpose of protecting the irrigation and power rights of the relators from alleged unlawful diversions of water above relators' canal by junior appropriators. The trial court denied the writ and dismissed the petition of the relators. Relators thereupon perfected an appeal to this court.

It is not disputed that the waters of the Platte river and its tributaries are subject to appropriation for irrigation and power purposes upon the principle that priority of time bestows priority of right, and that pursuant to such principle the Central Power Company, through its predecessors in interest, was adjudicated and given a priority upon the Platte river, as of September 10, 1882, of 140 cubic feet per second of flow of water for power purposes, and a further appropriation, as of February 12, 1920, of 485 cubic feet per second for the same purposes. It is also admitted by the pleadings that 22 second-feet of water have been adjudicated to certain lands in Buffalo county for irrigation purposes with a priority dating of September 10, 1882, and which, for the purposes of this suit, will be treated as the property of certain of the relators claiming to be the owners thereof in this litigation. The foregoing appropriations of water, bearing the priority dating of September 10, 1882, are prior in time to all appropriations on the Platte river and its tributaries in Nebraska except an appropriation to the Nelson Radcliffe canal in Morrill county with a priority dating of June 1, 1882, for 2.77 cubic feet of water per second of time.

The Central Power Company, in reliance upon its adjudicated water rights, reconstructed and rebuilt its power plant and diversion dam, and installed new machinery, appliances and equipment at a cost of $225,000 or more, to make it of sufficient capacity to beneficially use water to which it was entitled under its appropriations adjudicated

and allowed as of September 10, 1882, and February 12, 1920. The remaining relators are owners of land in Buffalo county, which is irrigable and irrigated from the waters carried in the Central Power Company canal during the irrigation season, said water being the 22 second-feet adjudicated to certain lands in Buffalo county under the priority dating of September 10, 1882, and appurtenant to said lands subject only to the payment of a carrying charge to the Central Power Company. That relators have constructed laterals leading to and upon their respective lands, and made beneficial use of all of the 22 cubic feet per second of flow under their appropriation whenever it was available in the river, is alleged in the petition. For the purposes of this suit only, this allegation will be considered as true.

The respondents, as officers, agents and employees of the bureau of irrigation, are charged by law with the duty of the administration and enforcement of the irrigation laws of the state and the distribution of the waters of the Platte river and its tributaries within the state in accordance with adjudicated priorities. It is the contention of relators that respondents, in administering and enforcing the irrigation laws of the state and in the distribution of water for irrigation, have continuously permitted and allowed junior appropriators, situated above the headgate of the Central Power Company, to take and use water for irrigation, storage, and other purposes, without regard to priority and to the prejudice and damage of the relators.

It is urged that the district court for Buffalo county was without jurisdiction to hear the case. The applicable statute provides: "Actions for the following causes must be brought in the county where the cause or some part thereof arose: * * * Second. An action against a public officer, for an act done by him in virtue of or under color of his office, or for any neglect of his official duty." Comp. St. 1929, sec. 20-404. The case at bar is clearly one seeking a remedy for the alleged neglect of official duty on the part of a public officer. Does the cause of action or some part thereof arise in Buffalo county? Generally speaking, a cause of action consists of a

wrong and a resulting damage. A wrong which does not result in a damage is not ordinarily actionable. In the instant case, the alleged wrongs occurred in the counties where junior appropriators upstream were permitted to divert water belonging to relators. The damage occurred in Buffalo county when relators' lands were deprived of needed irrigation water and the water-power plant of the relator power company was shut down for the reason that water alleged to belong to the power company was taken by junior appropriators. Without the subsequent damage, no cause of action could exist. It seems clear, therefore, that the "cause or some part thereof" arose in Buffalo county. We have examined *Platte Valley Irrigation District v. Bryan*, 130 Neb. 657, 266 N. W. 73, cited by respondents, and find nothing therein contained inconsistent with this view.

It will be noted that the priority date of the appropriation of 140 cubic feet per second of flow for power purposes is September 10, 1882. The appropriation of 22 cubic feet per second for irrigation purposes bears the same priority date. Under the holdings of this court, these water rights became vested as of that date. At the time of the vesting of these rights, no distinctions had been made between appropriations for irrigation and appropriations for power purposes. It is plain, therefore, that the irrigation laws of this state, the first of which was passed in 1889, and the Nebraska Constitution of 1920, do not divest the owners of these two appropriations dated September 10, 1882, of their vested interests in them. To hold otherwise would invite the exercise of the restraints imposed by the Fourteenth Amendment to the Constitution of the United States. *Enterprise Irrigation District v. Willis*, 135 Neb. 827, 284 N. W. 326. We think, therefore, that distinctions cannot be made between the power and irrigation appropriations involved herein, bearing the date of September 10, 1882. For all practical purposes, relators have an appropriation of 162 second-feet of water with a priority dating of September 10, 1882, as against all junior appropriators on the stream whether for irrigation or power purposes.

The North Platte river is a nonnavigable stream which has its source in the mountains of Colorado and flows across a part of Wyoming and Nebraska to a point approximately 200 miles from the Wyoming-Nebraska line, where it joins the South Platte river to form the Platte river. The present case involves the administration of irrigation and power rights on the North Platte and Platte rivers from the Wyoming-Nebraska line to the headgate of the Kearney canal located 13 miles west of Kearney, Nebraska. The water discharged into the Platte river from the South Platte river also has its place in the problem before us, but it does not appear to have been treated as of major importance by the parties in the present suit. The North Platte and Platte rivers will therefore be treated as the primary subject of the litigation. For the purposes of this suit, the upper end of the river is at the Wyoming-Nebraska line and the lower end at the headgate of the Kearney canal, it being the last point of diversion for irrigation and power purposes on the river.

That the state in the exercise of its police power may supervise and control the appropriation, diversion and distribution of the public waters of the state, and impose that duty upon administrative officers, is well settled. *Farmers Canal Co. v. Frank,* 72 Neb. 136, 100 N. W. 286; *Enterprise Irrigation District v. Willis,* 135 Neb. 827, 284 N. W. 326. The first irrigation laws in this state were enacted in 1889. In 1895 a comprehensive irrigation code was enacted which, as amended, appears as chapter 46 of the Compiled Statutes of Nebraska for 1929. The various statutory provisions thereof, providing for the distribution of water among different appropriators according to their respective priorities by administrative officers of the state, were undoubtedly enacted in the furtherance of a wise public policy to afford an economical and speedy remedy for those whose rights are wrongfully disregarded by others, as well as to prevent unnecessary waste and useless diminution of the waters of streams, and to avoid unseemly controversies that may occur where many persons are entitled to share in a limited

supply of public water for irrigation and power purposes. It is the duty of the state under our irrigation code to administer the waters of streams and rivers to prevent waste, to protect prior appropriators against subsequent appropriators, and to enforce all adjudicated water rights in accordance with their terms. In so doing, the officers of the state perform ministerial acts only, even though findings of fact may have to be determined before proper control and regulation may be intelligently exercised. The quasi-judicial powers conferred upon the department have application only to the granting and cancelation of appropriation rights and priorities. With these general propositions before us, the question to be determined is whether the state through its proper officers has failed to administer the waters of the North Platte and Platte rivers in accordance with the irrigation laws of this state, and, if so, whether relators are entitled to the issuance of a writ of mandamus.

A proper regulation and control of the segments of the North Platte and Platte rivers involved in this case require a consideration of all the factors entering into the administration of the waters of these rivers for the benefit of appropriators for irrigation and power purposes. In considering these factors, the two rivers and their tributaries will be treated as one, thereby obviating the necessity of referring to both when speaking of the whole.

The flow of the river even in the summer months is affected by the amount of snow falling in the mountains of Colorado within its drainage basin. The river passes through parts of Colorado and Wyoming, both of which states require irrigation water in excess of the available supply. Storage and control dams under the control of the federal government also exist along the river west of the point where the river enters Nebraska. Water rights, both senior and junior to existing rights and priorities in Nebraska, coupled with the uncertainty of their accurate administration, add to the indefiniteness of the amount of water that passes at any given time across the state line and under the control of the administrative officers of this state.

Losses from evaporation and transpiration are heavy, due to the wide and shallow character of the river. Changes of temperature and varying types of wind add to the uncertainty of the losses resulting from these changing conditions. Losses from percolation vary along the various sectors of the river. The evidence shows that the river valley from the Wyoming-Nebraska line to North Platte or thereabouts is underlaid with impervious formations which do not permit losses of subterranean waters into other watersheds. At some unknown point between North Platte and Gothenburg, the river cuts through the impervious formations and runs into the sheets of sand and gravel with which the territory is underlaid. Losses begin to occur at this point due to the percolation of river water through this sand and gravel formation, in a southeasterly direction into the basin of the Republican river. It was estimated by Professor A. L. Lugn, an expert on geology, stratigraphy and ground-water hydrology, that the loss to the Republican river basin would be from 50,000 to 100,000 acre-feet of water each year. It is true that a large part of this loss occurs below the headgate of relators' canal. This estimate is recited for the purpose of giving some idea of the nature and degree of the loss, without any hope of accurately measuring such losses occurring above the headgate of the Kearney canal. Experts with experience on the river estimate that the loss in delivering water from North Platte to the headgate of the Kearney canal with a wet river bed amounts to three times the amount of delivery, and with a dry river bed that it is almost impossible to get water through without a flood or a large sustained flow. In other words, it requires approximately 700 second-feet of water at North Platte to deliver 162 second-feet at the headgate of the Kearney canal when the river bed is wet. The underlying sand and gravel beds thicken as the river moves east. With the bed of the river on the surface of these sand and gravel deposits, it requires a huge amount of water to recharge the river channel and surrounding water table after the river bed once becomes dry. Until the water table is built up to the surface of the

river bed, the river channel will not support a continuous flow. It is also shown that the water table has been affected materially by pump irrigation. It was estimated that there are 500 irrigation pumps in Dawson county alone, which pump as much as 40,000 acre-feet of water in a single season. The evidence bears out the statement that the Platte river east of Gothenburg is a very inefficient carrier of water. In addition to the subterranean losses noted, the river spreads out, causing a broad surface of water and channel bed to be subjected to large evaporation losses. It is further established by early settlers along the river that it was not unusual for the river to go dry in July and August before irrigation was generally practiced along the river. That the river is generally considered a gaining stream, and can be so established by an examination of the statistical records of the mean flow for the calendar year, is borne out by the record. But it is just as clearly shown that the river is ordinarily a losing stream during the months of July and August, when the mean flow for that period is considered. These conditions and activities establish the cause of the huge losses of water between Gothenburg and the Kearney canal. They are important only as factors that must be considered by the officers of the state in distributing an insufficient supply of water to appropriators in the proper order of priority.

Appropriations of water are made throughout the length of the river. The priority dates of these appropriations have no relation whatever to their location on the stream. Hence, very early appropriations may be found at the upper and lower ends of the stream, while very late appropriations are likewise found at both ends. In times of water shortage, the later appropriators are the first to be deprived of water. The closing of canals in accordance with the inverse order of their priority dates necessarily requires certain canals to close their headgates all along the stream at the same time. Water moves down the stream at approximately 25 miles per day with the result that it requires approximately ten days to deliver water from the state line

to the Kearney headgate under normal conditions. The resulting lag therefore becomes an important factor to be considered. During the lag period, conditions over which the administrator of the river has no control may change or disrupt all calculations. Excessive heat, continued drouth, and unusual winds may greatly reduce estimated quantities of river-flow, or, on the other hand, low temperatures, rains and floods in the lower river basin may relieve immediate demands. These elements of uncertainty must be considered in protecting the rights of all on the stream. The position of relators at the lower end of the stream is in itself a recognized condition, and while they have the second oldest priority on the river, it is inescapable that their location subjects them to unfavorable conditions which are practically impossible to eliminate.

It must also be borne in mind that the amount of flow in the river at any given time during the irrigation season is nothing more than an estimate based on spot measurements. Accurate figures are not obtainable until several weeks after the immediate problem has been determined. The best available basis for the determination of the facts therefore is often very uncertain. The effect of the use of the river as a carrier of storage water also enters into the calculations. The best estimates of the administrator are often affected by unlawful diversions by junior appropriators, injunctions and restraining orders issued by the courts, errors of judgment by the administrator and his subordinates, dilatory compliance with closing orders, and inaccurate reports of rains, floods and weather conditions generally. All of the factors hereinbefore mentioned contribute to the uncertainty of an efficient and accurate distribution of water in accordance with adjudicated appropriations in the order of their priority.

The use of water for irrigation in this state is a natural want. The inadequacy of supply to meet the demands of the public requires strict administration to prevent waste. It is therefore the policy of the law that junior appropriators may use available water within the limits of their own ap-

propriations so long as the rights of senior appropriators are not injured or damaged. And so, in the instant case, junior appropriators may lawfully apply water to their lands within the limits of their adjudicated appropriations until the Kearney canal fails to receive its full appropriation of 162 second-feet. Until the senior appropriator is injured, there is the ever-present possibility of changed weather conditions, precipitation, or other sources of water supply which might alleviate the situation and supply the needs of the Kearney canal. To pursue any other rule would greatly add to the loss by waste of the public waters of this state. We conclude therefore that the use of water by a junior appropriator does not become adverse to or injure a senior appropriator until it results in a deprivation of his allotted amount, or some part thereof. This rule is supported, we think, by our decisions as well as the decisions of other states.

The real question to be decided, however, is the determination of the duty imposed upon the officers of the state in administering the waters of the stream when the available supply of water at the headgate of the Kearney canal is reduced to an amount less than the 162 second-feet to which the relators are entitled. The rights of relators to the use of this water as against all appropriators subsequent to September 10, 1882, cannot be questioned. It is the duty of the administrative officers of the state to recognize this right and to give force to relators' priority. This requires that junior appropriators be restrained from taking water from the stream so long as such water can be delivered in usable quantities at the headgate of the Kearney canal. If it appear that all the available water in the stream would be lost before its arrival at the headgate of the Kearney canal, it would, of course, be an unjustified waste of water to attempt delivery. Whether a definite quantity of water passing a given point on the stream would, if not diverted or interrupted in its course, reach the headgate of the Kearney canal in a usable quantity creates a very complicated question of fact. It therefore is the duty of the administrative officers

of the state to determine from all available means, including the factors hereinbefore discussed, whether or not a usable quantity of water can be delivered at the headgate of the Kearney canal. It necessarily follows that this finding of fact must be determined in the first instance by the officers charged with the administration of the stream. The finding of fact thus made is final unless it appears that it was unreasonable or arbitrarily made. The determination of the facts is an administrative function, and an order or course of conduct based thereon raises only the question whether the administrator was supported in his finding by evidence indicating his action was not unreasonable or arbitrary. The rule is that where the action of the administrative officer of the state is not unreasonable or arbitrary, and does not exceed the duties and powers imposed, this court will not interfere with the findings of fact so made because to that extent they involve an administrative, as distinguished from a judicial, function. The necessity of prompt, efficient and fair administration of the waters of a stream in a territory where irrigation is practiced has been demonstrated on many occasions. Such administration requires the exercise of judgment, experience, training, and statistical knowledge. The factors to be considered are numerous and intricate. Unless such findings be promptly made, it is ordinarily not necessary that they be made at all. The very necessities of the case require that the findings of the administrator be final unless shown to be unreasonable and arbitrary.

After determination that a given quantity of water passing a certain point on the river would not, even if uninterrupted, reach the headgate of the Kearney canal in usable quantities, the administrative officers of the state may lawfully permit junior appropriators to divert it for irrigation purposes. This results ofttimes in having junior appropriators receiving a head of water at a time when an appropriator farther downstream is getting none, though he is prior in time. Such situations are not therefore conclusive evidence of unlawful diversions.

*Amici curiæ* urge that the doctrine of reasonable use is in force in this state and that it should be applied to the case at bar. We recognize the principle that the public has an interest in the public waters of the state and it is the use thereof only that may be appropriated. Even though an adjudicated appropriation may be vested, it may be subjected to regulation and control by the state by virtue of its police power. It may likewise be circumscribed to the extent that a limited diversion for a specified purpose will not permit of an undue interference with the rights of other appropriators on the stream. But we cannot agree that the doctrine of reasonable use can be applied in a case where delivery of a usable quantity of water can be made, although the losses suffered in so doing are great. To permit the officers of the state the right to say whether prospective losses would or would not justify the delivery of usable quantities of water would clothe such officers with a discretion incompatible with the vested interests of the relators, and destroy the very purpose of the doctrine of appropriation existent in this state. When upstream appropriators applied for and received adjudicated priorities, they did so with the knowledge that there was an earlier appropriator at the lower end of the stream whose rights had to be recognized. When the relators applied for and received their adjudications, they are likewise presumed to have known that other appropriators would obtain inferior rights above them that would have to be recognized. Each is required to respect the vested rights of the others, even though some hardships may be thereby imposed. We therefore hold that the doctrine of reasonable use does not extend so far as to authorize the administrator of the waters of the stream to refrain from delivering a usable quantity of water to a senior appropriator because it might appear to him that excessive losses would result. The duty of the administrator, in administering the waters of the stream by virtue of the police power of the state, is to enforce existing priorities, not to determine, change or amend them. But in regulating the distribution of water it may become incidentally necessary for him to as-

certain for that purpose only whether a prior appropriator is injured by a diversion above him. This finding of fact must be made, not to change existing priorities, but in order to determine whether or not a distribution of water may be made to a junior appropriator in accordance with existing priorities.

It appears that, during the irrigation season of 1925 and following, water belonging to irrigators under the Kearney canal was diverted through the Dawson county canal into the Kearney canal by way of Buffalo creek in order to avoid the large losses that would have been sustained by using the river channel. These diversions were not objected to by the Central Power Company and were consented to by the water users under the Kearney canal. The contention is advanced that the Central Power Company thereby waived its power right. We fail to find any merit in this contention. The diversion by way of the Dawson county canal seems to have been made as an emergency measure and as a means of averting exceptional losses. No water for power purposes was ever routed through the Dawson county canal; in fact, this route did not have the capacity to carry water to which the Central Power Company was entitled under its first appropriation for power purposes. While it is true that diversions were made through the Dawson county canal when there was water in the river at the headgate of the Kearney canal, we fail to find any of the elements of a waiver on the part of the Central Power Company as to its appropriation for power. The Central Power Company has in fact been objecting to these diversions for several years last past and has insisted upon all deliveries being made by the river channel. An examination of the evidence on this subject requires our holding that none of the appropriation rights of the Central Power Company bearing the priority date of September 10, 1882, has been lost by waiver or abandonment.

The law imposes on the administrative officials of the state the duty to administer the water of the stream, as heretofore mentioned. The chief administrative officer, R.

H. Willis, testifies that he has so attempted to administer the waters of the stream. The petition points out no specific administrative act which relators desire to have performed. The evidence does show that in the summer of 1937 a large quantity of water passed the state line as a result of heavy rains and floods in Wyoming. That this water should have reached the Kearney canal and provided water at a critical period cannot be denied. Relators complain that they never received any of this water. The water administrator testifies that the failure to deliver some of the water to the Kearney canal was due to incorrect advices as to the amount of water passing the state line, and to mistaken judgment in estimating the losses from the state line to the Kearney canal. Clearly, relators should have received 162 second-feet of water from these flood waters, which they did not receive. That they failed to obtain it because of an error of judgment is not controverted by evidence, although relators claim the failure was due to the continuation of a long-existing unlawful practice. In any event, the water administrator concedes that the water should have been delivered and that he intended it to be delivered.

The record shows that the petition of relators was filed on January 29, 1938, after the close of the irrigation season. Consequently, we fail to see how respondents could at that time be in default of an administrative duty imposed upon them by law. All alleged defaults occurred long before the petition was filed. The correct rule in this state is: "To warrant the issue of mandamus against an officer to compel him to act, (1) the duty must be imposed upon him by law, (2) the duty must still exist at the time the writ is applied for, and (3) the duty to act must be clear." *State v. Barstler*, 122 Neb. 167, 240 N. W. 273. Relators contend that it was impossible to commence the suit at the time of the actual default because of the limited time for preparation. While it is true that relators probably were unable to make preparation for trial during the period of default, we fail to see how this would excuse the timely commencement of the action. We doubt not that, if a default had existed at the

time the writ of mandamus was applied for, the court would have jurisdiction to determine relators' right to it even if the default no longer existed when the case came on for trial. Neither do we doubt the right of the court, if default exists, to issue the writ of mandamus and make it effective as to the performance of similar duties in the future. Any other rule would require the courts to administer justice piecemeal. But we are obliged to adhere to the rule that a default must exist when the writ is applied for, to properly invoke the extraordinary writ of mandamus. The administration of the waters of the stream must be in accordance with the law announced in this opinion. The administrator testifies to his willingness to so administer the stream and, in fact, contends that he has so administered it. We doubt not that he will endeavor to so administer it in the future. That the application for a writ of mandamus in case of default of duty on the part of respondents is the correct remedy cannot be questioned. The pleadings and evidence, however, fail to disclose a default of any ministerial duty on the part of respondents at the time the writ was applied for. In addition thereto, respondents indicate a willingness to administer the waters of the stream in accordance with established law. A writ of mandamus requiring the respondents to enforce all the irrigation laws and appropriation rights of relators is too general in character to invoke coercive processes and subject respondents to summary proceedings for a violation thereof. The issuance of the writ is subject to the sound judicial discretion of the court. After a consideration of the pleadings, the evidence, and all the circumstances surrounding the case, we think the trial court was justified in the exercise of such discretion in denying the writ prayed for. We likewise believe that the action will accomplish the desired end without the issuance of the writ at the time and in the form in which it was asked. We therefore hold that the district court did not err in denying the writ.

AFFIRMED.