REQUESTED BY: Dear Senator:
You have asked several questions pertaining to the constitutionality of section 3 of LB 217. You specifically inquire about the provisions of subsections (2) and (3) of section 3 which provide:
 "(2) Within ninety days after the effective date of this act, each natural resources district shall adopt, following prior hearing, notice of which shall be given in the manner provided in section 46-658, rules and regulations necessary to control or prohibit surface runoff of water derived from surface water irrigation. Such rules regulations shall prescribe (a) standards and criteria delineating constitutes the inefficient of improper runoff of surface water use irrigation, (b) procedures to prevent, control, and abate such runoff, (c) measures for the construction, modification, extension or operation remedial measures to prevent, control, or abate runoff of surface water used in irrigation, and (d) procedures for the enforcement of this section.
 "(3) Each district may issue cease and desist orders to enforce any of the provisions of this section or rules and regulations issued pursuant to this section, such order may be issued against an individual, partnership, association, corporation, company, cooperative, irrigation district, or irrigation company."
 I.
You first ask whether subsection (2) constitutes an unlawful delegation of power to a natural resources district (hereinafter NRD). Subsection (1) of section 3 provides that anyone using surface water for irrigation shall control or prevent the runoff of water so used for the purpose of conserving water supplies and preventing inefficient or improper runoff. Subsection (4) provides that the regulations adopted pursuant to subsection (2) `shall recognize the necessity of properly managed return flows.' The task determining what is inefficient and improper runoff, and the procedure and measures to be taken for implementation and enforcement of the act is delegated to each of the twenty-four NRDs in this state. Since the Legislature has previously vested the NRDs with certain powers, they are governmental subdivisions. (See, e.g., section2-3225, R.S.Supp., 1976, power to levy a tax; section 46-656, et seq., R.S.Supp., 1976, powers over ground water control areas.) In Peterson v. Cook, 175 Neb. 296, 121 N.W.2d 399
(1963), the court discussed some of the principles applicable to this question.
 "It is a well-settled rule, supported with practical unanimity by the authorities, that the general doctrine prohibiting the delegation of legislative authority has no application to the vesting in political subdivisions of powers to govern matters which are local in scope. . . ."
It is also well settled that the Legislature may delegate to a governmental subdivision the details of implementing a statute.State v. Cutright, 193 Neb. 303, 226 N.W.2d 771 (1975).
The boundaries of the NRDs are determined according to hydrologic patterns and generally encompass areas with related resource problems. See, section 2-3203, R.R.S. 1943. Due to the differences in terrains, porosity of soils, hydrologic patterns and other conditions occurring in the various NRDs, it is logical to assume that different procedures and measures may be necessary to control runoff in each NRD What may be inefficient or improper runoff in one NRD may not be so in another. Obviously, it would virtually be a physical impossibility for the Legislature to visit each district and make the technical determinations necessary under subsection (2). These determinations are local in scope.
Thus, we believe that the Legislature may properly delegate the responsibility for making and enforcing these determinations to the NRDs.
 II.
You next ask whether subsection (2) of section 3 creates vague and uncertain standards which would deprive a person of property without due process of law in contravention of ArticleI, Section 3, of the Constitution of Nebraska. As noted above, the Legislature may properly delegate the implementation of section 3 to the NRDs. We believe that the same factors permitting delegation as discussed above also require broad and flexible standards to guide the NRDs in their implementation. The necessity of providing standards flexible enough to insure the effective application of legislative policy to changing circumstances and different situations requires the use of such words as `inefficient' and `improper.' See, 1 Davis, Administrative Law Treatise,
§ 2.07 through § 2.13 (1958) and Supplement (1970).
The standard used by the courts in determining whether legislation is vague and uncertain is set forth in Bridgeford v.U-Haul Company, 195 Neb. 308, 238 N.W.2d 443 (1976), wherein the court ruled that a statute is not vague unless men of normal intelligence would necessarily have to guess at its meaning or would usually differ as to its application. In Nieman v. Nebraska NaturalResources Commission, 191 Neb. 672, 217 N.W.2d 166 (1974), the court expounded upon this proposition.
 ". . . It is a general rule that a statute must be reasonably clear and definite to be valid. . . . But a statute which is otherwise valid will not be held void or unintelligible and meaningless unless it is so imperfect and deficient in its terms as to render it impossible of execution enforcement. If the intent and purpose of the Legislature can be ascertained and the statute is susceptible to a reasonable construction which support and give it effect, the statute will be held valid." Id.
at 675.
We believe that the words `inefficient' and `improper' and the other terms employed in subsection (2) are terms of common understanding and clearly men of normal intelligence would not have to guess at their meanings. The interest and purpose of section 3 certainly is clear and we cannot say that the terms employed are so unintelligible and meaningless as to render them incapable of execution and enforcement. Thus, we believe that the standards contained in subsection (2) are not impermissibly vague and uncertain under Article I, Section 3, of the Constitution.
 III.
You next inquire whether subsection (3) has the effect of impairing the obligation of contracts contrary to Article I, Section 16, of the Constitution of Nebraska. You note that many surface water irrigators have contracted with irrigation districts whereby the district agrees to deliver water to the irrigator for a fee. You are concerned that subsection (3) would allow the NRD to issue a cease and desist order prohibiting the delivery of irrigation water to any consumer who failed to prevent or control runoff pursuant to NRD rules and regulations.
Article I, Section 16, provides that no law impairing the obligation of contracts shall be passed. Article XV, Section 4, of the Constitution declares that the necessity of water for irrigation purposes in this state to be a natural want. Article XV, Section 5, of the Constitution dedicates the water of every nature stream within the state to the people of the state. InState ex rel Cary v. Cochran, 138 Neb. 163,292 N.W. 239 (1940), the court stated:
 "That the state in the exercise of its police power may supervise and control the appropriation, diversion and distribution of the public waters of the state, and impose that duty upon administrative officers, is well settled. . . ." Id. at 168.
This duty has been imposed largely upon the Department of Water Resources by Chapter 46, art. 2, of the Revised Statutes of Nebraska. Our court has long adhered to the rule that it is the duty of the state to prevent the waste of waters available for irrigation purposes and to secure the greatest benefit possible from available irrigation waters. State ex rel. Cary v.Cochran, supra; State v. Birdwood Irrigation District,154 Neb. 52, 46 N.W.2d 884 (1951). Thus, there is little doubt that the stated purpose of section 3 of LB 217 is a proper subject for an exercise of legislative police powers.
It is generally held that contractual rights must yield to the public welfare where the latter is appropriately declared and defined by a valid legislative enactment under the state's police power. Placek v. Edstrom, 151 Neb. 225, 37 N.W.2d 203,cert. denied, 338 U.S. 892 (1949). Our court has previously recognized the supremacy of the public welfare in the use of surface waters for irrigation purposes. In McCookIrrigation Water Power Company v. Burtless, 98 Neb. 141,152 N.W. 334 (1915), the irrigation company had contracted to provide its consumers with water at the rate of one dollar an acre a year. The company sought and was granted the authority to increase the rate to two dollars per year from the State Railway Commission. The consumers brought an action claiming that the commission's action impaired the obligation of their contracts and that the one dollar rate fixed in the contract was a property right with which the state, in the exercise of its regulatory power, could not interfere. The court recognizing the paramount public interest in the regulation of the use of surface water for irrigation purposes, rejected the consumers' argument, stating:
 ". . . [A]ny contracts entered into between the irrigation company and consumers under the ditch, with reference to the annual rates which should be charged for the use of water, were entered into with the law forming a part of the contract, and were subject to legislative control. . . .' (Emphasis added.) Id. at 145.
Likewise in State v. Birdwood Irrigation District, Supra,
the Department of Roads Irrigation canceled part of the district's appropriation for non-use under statutory authority which had been enacted subsequent to the acquisition of the district's water right. The court, again recognizing the overriding interests in the state administration of public waters, held that the statutory provisions were applicable and ruled:
 ". . . The adjudication of the water right gave to the Birdwood Irrigation District and its predecessors in interest a vested right to the use of the waters appropriated, subject to the law at time the vested interest was acquired and such reasonable regulated subsequently adopted by virtue of the police power of the state. Enterprise Irrigation District v. Willis, 135 Neb. 827, 284 N.W. 326; State ex rel. Cary v. Cochran, 138 Neb. 163, 292 N.W. 239." (Emphasis added.) 154 Neb. at 55.
Thus, it appears that any contract entered into between an irrigation district and an irrigator is subject to reasonable regulation under the state's police power. Control of runoff appears, on its face, to be a reasonable means of conserving water which is a legitimate subject of state regulation. (Whether controlling runoff surface water does, in fact, conserve water of promote any other public benefit is a question of fact with which we are not herein presented.
You note that section 46-160, R.R.S. 1943, makes any irrigation district liable in damages for negligence in failing to deliver irrigation water. As a general principle, performance of a contract is excused where performance is rendered impossible by law as long as the promisor is not at fault. Columbus River Power LightCompany v. Columbus, 249 U.S. 339 (1919). A district could certainly not be considered negligent for failure to deliver irrigation water under section 46-160 if an NRD ordered the district to refrain from delivering water to an irrigator until the irrigator complied with runoff control regulation
 IV.
Lastly, you question whether section 3 violates the due process clause of the Constitution because it does not provide for a hearing of any kind prior to the issuance of a cease and desist order under subsection (3).
Section 3 of LB 217 pertains to the control of runoff from surface water irrigation and amends no existing statute. Section 3 does not provide for a hearing before or after the issuance of a cease and desist order nor does it provide a procedure for judicial review of such an order. Although the NRDs may choose to provide for prior hearings in their rules and regulations, the law does not require it.
Certainly an appropriator of surface water who has complied with the statutory requirements holds a vested property right in the use of that water. Enterprise Irrigation District v.Willis, 135 Neb. 827, 284 N.W. 32 (1939). Although an NRD would presumably have other alternatives besides depriving the noncomplying irrigator of water, any order which could prevent an irrigator from receiving life sustaining water could obviously deprive him of his livelihood. The concept of procedural due process general affords to every person the constitutional right to notice and hearing sometime before a final taking of his life, liberty or property. Stauffer v. Weedlum, 188 Neb. 105,195 N.W.2d 218, appeal dismissed, 409 U.S. 972 (1972). The question of exactly when a hearing is required, if a all, is a balancing process. In Stauffer v. Weedlum, supra,
a motor vehicle license revocation case, the court discussed this question at length:
 ". . . The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss, . . . and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. . . . [C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. . . . It is true, of course, that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing. . . . [The United States Supreme Court] has long recognized that the requirements of due process may vary according to the nature of interest to be protected and the likelihood of harm to the individual. . . . The due process of law provisions do not prevent an administrative agency in every case from issuing an order affecting the private rights of individual without formal notice and hearing before such order. The due process requirements may under some circumstances be satisfied if full hearing in the courts is available after the administrative order with judicial power to stay irreparable injury pending court hearing. . . ." Id. at 112-113.
The court in Stauffer ruled that the statutory procedures for judicial review entailing a full evidentiary hearing after the administrative order revoking the driver's license would satisfy due process requirements since the administrative action was ministerial only. The court distinguished cases involving administrative exercises of discretion, stating that such actions may require notice and hearing to protect the individual against mistake.
As noted above, the NRDs are given broad discretion under section 3. Section 3 vests the NRDs with legislative, executive, administrative, and quasi-judicial powers. Since Section 3 lacks any procedures for notice and hearing, either before or after the order, it appears to be constitutionally deficient.