JOHN N. FENTON, APPELLEE, V. TRI-STATE LAND COMPANY, APPELLANT.

FILED JUNE 13, 1911.   No. 16,386.

1. **Waters:** IRRIGATION: CONVEYANCES: CONSTRUCTION.   Where an irrigation company purchased the property of a former corporation which had constructed and was operating an irrigation canal under a deed which provided, "subject, however, to any valid rights under certain water-right contracts issued by the Farmers Canal Company for about two thousand (2000) acres of land to various parties owning land under said ditch or canal," and at the time there were on the line of the canal headgates, laterals, and other indicia of the rights of the contract holders, it will be held to have purchased subject to the rights of all claiming under such contracts, since the exception is general in its terms.

2. **Equity** looks at the substance of things rather than the form, and will endeavor to carry out the real intent and purpose of the parties to a contract.

3. **Waters:** IRRIGATION: CONVEYANCES: CONSTRUCTION.   Where the intention of the owners of the stock in an irrigation company was to retain certain water rights, and at the same time to convey to other parties their canal and prior appropriation of water, and this was done by means of the transfer of stock and issuance of water right contracts, a court of equity will treat the transaction as it actually was, and not as it appeared to be, in order to protect the rights of the original stockholders.

4. ———: ———: CONTRACTS: VALIDITY.   An agreement to pay for property in an irrigation ditch by annual payments or by waiving the right to assess the sellers (who were, consumers under

the ditch) for the maintenance of the ditch is not necessarily invalid as against public policy

5. ———: ———: ———: ———. Under the facts stated in the opinion, a contract made in 1890 with an irrigation company, whereby it agreed to convey and deliver to the other party, his heirs and assigns a specified quantity of water by means of its canal, in perpetuity, conveyed an easement in the ditch, and was not invalid for the reason that the grant exceeded the term of its corporate existence.

6. ———: ———: PRIORITY OF RIGHTS. Where, in 1891, certain owners of an irrigation canal which was in operation for a distance of about ten miles conveyed the same, reserving to themselves a perpetual right to water under a common agreement, the court will apply the provisions of chapter 68, laws 1889, and hold their rights equal as to each other, but superior to those of consumers under a new section of canal beginning at the end of the ten miles already in operation.

7. ———: ———: ———. Under the 1889 act, portions of an irrigation canal may be severable as to the rights of consumers of water.

8. ———: IRRIGATION COMPANIES. A stock corporation formed for the purpose of constructing an irrigation canal, though private as to its manner of organization, is of the nature of a public service corporation. Its rights and duties are modified by the nature of its functions. It cannot serve the public generally, but only the occupiers of land lying under the ditch. Its duties to the respective consumers may be modified and affected by the operation of rights of priority and by the operation of the police powers of the state.

APPEAL from the district court for Scott's Bluff county: HANSON M. GRIMES, JUDGE. *Affirmed as modified.*

*Wright, Duffie & Wright.* and *Isaac E. Congdon,* for appellant.

*Morrow & Morrow, contra.*

LETTON, J.

This is an action to quiet the title of plaintiff to certain water rights, and to enjoin the defendant the Tri-State Land Company from closing or obstructing the plaintiff's

lateral headgate and preventing him from conducting
through the canal and lateral headgate the amount of
water specified in a certain water right contract. The
plaintiff and certain cross-petitioners seeking substan-
tially the same relief prevailed in the action, and from the
judgment the Tri-State Land Company, defendant, ap-
peals. The pleadings in the case are exceedingly volu-
minous, covering over 600 typewritten pages; but, since
the questions presented are mainly questions of law, it will
be unnecessary to do more than state the facts and the
principles of law which the contending parties respectively
contend are applicable.

In 1887 W. R. Akers, Charles W. Ford, and John Rich-
ards incorporated the Farmers Canal Company in Chey-
enne county, Nebraska. The articles of incorporation pro-
vided that the general nature of the business should be "to
acquire, construct, operate and maintain a canal, taking
water from the North Platte river in said county and state,
and diverting and appropriating water from said river,
sufficient at all times to fill said canal, as may be necessary
for the use of persons taking water therefrom, and con-
ducting water through said canal, and leasing, selling, and
otherwise disposing of water rights to persons owning
lands under said canal, for the purpose of irrigation, do-
mestic use, manufacturing and other useful purposes."
The authorized capital stock was fixed at $80,000, in shares
of $100 each. After the incorporation of the company, a
notice of appropriation dated September 16, 1889, signed
by the president and secretary of the corporation, was
posted, setting forth that the company had appropriated a
sufficient quantity of water to fill a canal 40 feet wide on
the bottom and carrying water to the depth of 4 feet, and
naming the point of diversion. Afterwards the incor-
porators with a number of other landowners in the vicinity
subscribed for stock of the corporation. A small amount
of the subscription price was paid in cash and the remain-
der in work upon the canal, for which receipts were given

34

by the officers of the corporation.  W. R. Akers, who was
a civil engineer of experience in irrigation matters, had
selected what was then believed to be the most favorable
location on the North Platte river in the vicinity of the
proposed canal as the point of diversion.  Little work was
done upon the canal that year, but during the three follow-
ing years nearly ten miles was excavated, a headgate put
in, and water turned into the ditch.  As originally con-
structed, the canal was 16 feet wide at the head and about
6 feet wide at the lower end, and was not large enough to
water all the land that it was originally intended to serve.
In the adjustment of the respective interests of the owners,
the water was apportioned by the miner's inch, and it was
provided that a 40-acre water right should be represented
by one share of capital stock of $100, giving the right to
40 inches of water.  In the fall of 1890 $5,700 of stock or
receipts had been issued.  The original books and papers
have been lost, and the proof of these facts is from mem-
ory only.  The intention of the original incorporators was
that the canal should extend a long distance down the val-
ley, and they believed that their rights were very valuable.
They were unable to procure the funds necessary to carry
out the undertaking.  In the fall of 1890 certain negotia-
tions were had between the stockholders and W. H. Wright
and two associates.  These men were desirous of obtaining
the appropriation which it was believed the Farmers Canal
Company had acquired, and the right to build a canal
taking its water at the same point of diversion.  After
several meetings, it was finally agreed between those in-
terested in the company and Wright and his associates that
in consideration of the payment into the treasury of the
company of $1,000 in cash to be expended in finishing the
ten miles of canal already constructed so as to make the
water therein available to the landowners interested, and
the execution of contracts conveying to the individual
stockholders of the company, in proportion to their shares
or interests, preferred water rights, the old stockholders
would surrender to Wright and his associates their stock

and the control of the company. After a tentative agreement had been made, a form of contract or certificate was agreed upon which was to be issued to the old stockholders. It was also agreed, upon Mr. Wright's suggestion, that, in order to save time, the business be conducted by the old officers until such time as the new parties were ready to make the change. After the agreement was made $1000 was paid over, and printed contracts according to the form agreed upon were executed and delivered to the respective stockholders, part of them by the old officers, John W. Weeks, president, and C. W. Ford, secretary, and part by the new officers, W. H. Wright, president, and D. D. Johnson, secretary. The money paid in was used upon the canal as agreed and for several years thereafter water was supplied to the owners of these contracts by the company. Soon after the new parties obtained control, they concluded that the nonassessable features of the contracts were void and unenforceable. They served printed notices upon some of the contract holders that, while they would furnish water they did not recognize the validity of these provisions of the contracts. It is shown, however, that, whether the contract holders were served with such notice or not, the company supplied the water free of charge to all stockholders and made no effort to collect any sum for maintenance. In 1896 the company became embarrassed financially, and the water-users were notified that, if they desired water, they would have to look after the ditch themselves. They met, formed an organization, and assessed themselves a sufficient amount each year to pay a ditch-rider who superintended the ditch and apportioned the water among them. The canal company bore no portion of this expense, but gave its consent to use the ditch under this arrangement.

Before this time (but after the plaintiff and others were taking water from the ditch under the contracts) the company executed a trust deed upon all its property and franchises to secure certain bonds. Default being made, the trust deed was in 1901 foreclosed in the circuit court of the

United States. The result of these proceedings was that the property was sold at foreclosure sale and purchased by one Roberts Walker. The sale was made subject to certain specified water-right contracts. In October, 1904, Roberts Walker, the purchaser at the foreclosure sale, acting as trustee for the bondholders, sold and conveyed all the right, title, and interest in the property acquired by such proceedings to the Tri-State Land Company, defendant. The deed contained the clause, "subject, however, to any valid rights under certain water-right contracts issued by the Farmers Canal Company for about two thousand (2000) acres of land to various parties owning land under said ditch or canal." The Tri-State Land Company took possession under this deed, and soon afterwards began to enlarge and extend the canal. In doing this, they took out the plaintiff's headgate in order to widen the ditch, and put in another one, making the inlet so high that afterwards no water flowed through it. Practically the same proceedings were had with respect to the water supply of the other contract holders. The contract holders claim the right to the use of water under the contracts upon land described in their cross-petitions lying under the first ten miles of ditch.

In the answer of the Tri-State Land Company, it insists and claims that it did not purchase the canal subject to these contracts and water rights and is not bound by the terms of the same; that the contracts are void; and that it owns the canal and appropriations unincumbered by any of these water-right contracts. Similar questions were raised, but not decided, in *Clague v. Tri-State Land Co.*, 84 Neb. 499. A number of matters of defense pleaded are not supported by the evidence and it is unnecessary to notice them. At the trial defendant announced, and it was made a part of the record, "the Tri-State Land Company has at all times, and now does, refuse to recognize, as valid and binding upon it, these water contracts, in the form, as drawn, providing for the preferential use of water, without assessments. But the company, * * * at all times and

now, is perfectly willing to recognize the contracts, as valid and binding upon it, so far as the granting of water rights is concerned to each one of these parties, without any charge therefor, but contends that that water right must be without preference and that the holders thereof must pay a reasonable maintenance charge per annum."

It takes a similar position in this court. This concession materially narrows the inquiry, and takes away the necessity of considering a number of the points argued in the defendant's brief. An interesting and elaborate brief has been filed by the defendant containing a summary of the legislation in this state with respect to irrigation. It is argued that, under the statutes of this state, an irrigation company has always been a public service corporation having the right of eminent domain, and that consequently it must serve the public upon equal terms and without preference or discrimination; that the contracts in controversy here, in so far as they interfere with this statutory duty, are *ultra vires* and beyond the power of the corporation to enter into; that it was the intention of the legislature to depart from the principles governing the use of water in the arid states to the west of us; that in these states there were always people and land waiting for water, but that in this state the first settlers were in the eastern portion and knew nothing of irrigation; that the legislature in the passage of the first act in relation to the subject in 1889 intended that a canal should be built in a new country as railroads had been built in a new country, and that settlement would follow the canal as it had followed railroads. On the other hand, the plaintiff claims that by the contract he acquired an easement in the canal for the purpose of conducting the amount of water specified in the contract to his land; that the consumer is the real appropriator from the natural stream and the canal company merely a common carrier of the water.

A number of interesting questions are presented and ably argued in the respective briefs, but it seems to us that the respective rights of the parties in this controversy may

be determined upon broad equitable principles, and that unless an emergency arises, which under the evidence as to the amount of water in the North Platte river and the capacity of the canal may never happen, it is unnecessary to consider or decide many of them at this time.

At the time that the Farmers Canal Company was incorporated, there was no statute in this state providing for the appropriation of water from the public streams of the state. The only statute then in existence was the act of 1877 (laws 1877, p. 168) which provided that corporations organized for irrigation or water-power purposes might acquire right of way necessary "in the same manner as railroad corporations may now acquire right of way for the construction of railroads," and that such canals are declared to be works of internal improvement. In 1889 a complete act (laws 1889, ch. 68) evidently intended to cover the whole subject of irrigation was passed. The transfer of ownership of the Farmers Canal Company from the incorporators to Wright and his associates was made after the passage of the latter act, and the legality of the contracts must be measured by the law as it then stood, subject of course to any limitations subsequently made under the police power of the state. Our attention has not been called to any provisions of the comprehensive statute of 1895 which denounce contracts of the nature of these, and hence we find it unnecessary to consider it, and have endeavored to determine the validity of the contracts under the law existing at the time that they were entered into.

It is an old and well-established principle that equity looks to the substance of things rather than the form. Even in a mandamus proceeding this court has looked at a stock corporation as being *de facto* a mutual irrigation company. *Swanger v. Porter*, 87 Neb. 764. It is clear from the evidence that it was the desire of Mr. Wright and his associates to obtain the advantage, either real or supposed, which the Farmers Canal Company had procured by its prior appropriation of water and of the particular place on the river most suitable as the point of diversion for a

canal intended to extend to a distance of many miles beyond the terminus of that already constructed. There was little inducement for any one not interested as a consumer of water to advance any money for the purpose of completing, or to acquire any interest in, the canal already constructed, unless as an opening for a larger enterprise. The land which the new parties desired to irrigate lay beyond the first ten miles, but the existing headgate, point of diversion, and right to take the water were evidently thought to be of great importance to the new scheme. The original stockholders desired to retain their right to the water to the extent they had acquired it, but they were willing that the canal should be enlarged and the existing right of way over their lands used for the purpose of carrying water beyond them. They might have retained the ownership of their canal and their right to the water appropriated, and yet on payment of an agreed compensation have permitted a new company to have the canal enlarged and to have water appropriated by it carried through the same headgate to a new canal beginning at the terminus of the original canal. A canal and the right to the water therein may be severable into sections. *Canal Co. v. Gordon*, 6 Wall. (U. S.) 561; *Reynolds v. Hosmer*, 51 Cal. 205. We have not been pointed to any statute or legal principle which would render a contract effecting the same purpose, but reaching the result by a different method, unlawful. If such a method as described had been followed, no one would assert consumers lying below the terminus of the first section of the canal and using the appropriation made therefor would be equal in right to the consumers under the original canal. Viewing the whole transaction as it actually was, and not merely with respect to its form, we see nothing illegal in the preservation by the original owners of their existing rights while at the same time permitting the new owners the right of enlargement and extension to reach new fields. *City of South Pasadena v. Pasadena Land & Water Co.*, 152 Cal. 579; *Orcutt v. Pasadena Land & Water Co.*, 152 Cal. 599.

Are the provisions of the contract exempting the holders from the payment of assessments against public policy and void? Conceding the contention of the appellant that a corporation owning a canal and carrying water for the purpose of irrigation occupies the same position with reference to the public and to water-users as does a railway corporation, we may inquire whether contracts somewhat similar in nature made by railroad corporations are not enforceable. Prior to the passage of the federal and state statutes prohibiting the issuance of free transportation, it was not infrequent that railroad companies in settlement of suits for damages, or in payment for right of way or for services rendered, contracted to deliver to individuals free transportation over the whole or a portion of their lines. *Atchison, T. & S. F. R. Co. v. English,* 38 Kan. 110. We are not aware of any instances prior to the enactment of the statutes referred to wherein such contracts were held invalid as being beyond the power of the railroad companies to enter into. In California, before the adoption of the constitution of 1879, irrigation corporations were at liberty to enter into contracts with reference to the price and use of water upon such terms as might be satisfactory, and whether the contract was well advised or not was not a question for the courts, in the absence of fraud, mistake, or other elements which render ordinary contracts void or voidable. *San Diego Flume Co. v. Souther,* 90 Fed. 164; *Fresno Canal & Irrigation Co. v. Park,* 129 Cal. 437; Wiel, Water Rights (2d ed.) sec. 419.

And so in Colorado, in the case of *Grand Valley Irrigation Co. v. Lesher,* 28 Colo. 273, which is very similar in its facts to this case, four landowners organized a corporation and constructed a ditch for the irrigation of their lands. Another corporation was later organized by other parties for the irrigation of a larger tract, diverting the water at the same point on the river. The incorporators of the original company then agreed that, in consideration of the surrender of their franchise to the latter company, they should each receive a certificate to a water right of a

definite number of inches from the ditch of the latter company free from all dues and assessments. The second company mortgaged its property. The mortgage was foreclosed and the ditch purchased by a third corporation. This corporation notified the owners of these certificates that they had no right to receive water free of cost, and threatened to deprive them of the use of water unles they paid the regular assessments thereafter. The action was then brought to quiet the title to the water rights obtained by means of these certificates. The court held that the action was one to quiet title of plaintiff to an alleged easement; that the acknowledgment of the obligation to deliver the specified quantity of water through the ditch was a conveyance in writing of an easement therein; and that, since the defendant purchased the ditch with knowledge of the existence of the certificates and the physical evidence conveyed by the cultivated land, the lateral ditches and the headgates, they purchased the property subject to the existing easement. The judgment of the district court quieting the title was affirmed. *Hargrave v. Hall*, 3 Ariz. 252; *Wutchumna Water Co. v. Ragel*, 148 Cal. 759; *Stanislaus Water Co. v. Bachman*, 152 Cal. 716.

Whatever the form of the transaction whereby Wright and his associates obtained possession of the property of the original appropriators and the right of way for their proposed canal, in substance it was really an agreement that in exchange for the property the canal company would release these parties from the annual assessments. Suppose that instead of making such contracts they had paid to each stockholder, or to the company for distribution to the individual stockholders in proportion to their shares, a sum of money which placed at interest would furnish an annual fund sufficient to meet the necessary assessments for the upkeep of the ditch, or had agreed in consideration of the transfer to pay a certain sum annually to each stockholder, could such transaction be said to be against public policy, or to be void as discriminatory? The testimony is that the appropriation, the partially constructed ditch,

the headgate, and the right of diversion at that particular point were worth a large amount of money. Practically the only consideration these contract holders received for all their interest in the corporation except their right to water was relief from the annual assessments. The $5,700 worth of labor and money spent was returned to them in water rights of that value, but nothing was paid for the value of the right to the location or for the appropriation of water in excess of that retained, except the relief from annual charges. What is there in the articles of incorpora- tion or in the statute to prevent the corporation paying for property either by lump sum or by an annual contribu- tion? Relief from an assessment is practically the same as if the company itself paid the necessary sums out of its treasury. We know no reason why either form of pay- ment is not permissible. The immediate effect probably was to relieve the company from the payment of a large sum of money, and at a time when it was not easy to float enterprises of this nature. No consumer of water under the ditch is before the court complaining that by the en- forcement of these contracts the necessary charges for his use of the canal will be excessive. The corporation alone complains, and the sole question is whether, after having purchased with notice of the existence of these con- tracts and with its eyes open, the defendant company can refuse to carry them out on the ground of public policy. This we are satisfied it has no right to do. The case is dis- tinguishable from *Sammons v. Kearney Power & Irriga- tion Co.*, 77 Neb. 580. The contract considered in that case created a monopoly in the use of water for the generation of electric power, and the light company had no prior right to water.

The question as to the validity of the preference given may prove to be merely academic, but we think it proper to give it some consideration. The contracts are alike in providing that each contract holder shall have water "first in preference over any and all subsequent stockholders in the canal." Sections 12 and 13, act of 1889 (laws 1889, ch.

68), which were in force when the contracts were made, provide:

"Section 12. In case the volume of water in any stream is not sufficient to supply continually the wants for irrigating purposes of the owners or proprietors of land in any district or neighborhood in which customs exist for distributing the waters amongst such owners or proprietors, the waters diverted must in such case be held to be a common right in those accustomed to the participation in the use and enjoyment of such distribution, and such customs must be upheld in all courts as conferring such common right in the same. But this section does not affect any prior vested rights.

"Section 13. In case any person, company or corporation has constructed a ditch for the purpose of diverting the water of any river, creek, canyon, ravine or spring, for the purpose of selling the water thereof for irrigating purposes, the owners or cultivators of said land along the line of and covered by said ditch or canal, are entitled to and have the right to the use of water from said ditch or canal, for the purpose of irrigating said land, so owned or cultivated in the following order: First. All persons through whose land such ditch or canal runs are entitled to the use of the waters thereof in the order of their location along the line of said ditch or canal. Second. After those through whose land the ditch or canal runs, those upon either side of the line of the ditch or canal are entitled to the use of the waters thereof, those equally distant from the line of said ditch or canal are entitled to priority in the order of their location along the line of said ditch or canal; provided, that in times of scarcity of water the same shall be equally distributed to the consumers thereof."

Under these provisions it is plain that the rights of the original stockholders must be held to be a common right by virtue of their own previous custom and agreement, and that their priority, in the absence of any such agreement, would have been in the order of their location along the line of the canal. We must consider the contract holders

equal in priority as against subsequent consumers, whose lands lie beyond the ten miles of the original ditch, but perhaps subject to the statutory requirement that in time of scarcity the water shall be equally distributed. This, however, has not been argued and it is unnecessary to determine.

The argument that the corporation could not grant a perpetual water right we think is not tenable. The right to have the water from the river conveyed to the headgates of the respective contract holders and their assigns is of the nature of an easement in the ditch. This being so, it could be sold and conveyed, and may be granted in perpetuity. It is descendible and devisable, subject, however, to regulation under the police powers of the state, and appurtenant to the land for which it was appropriated or to which it has been applied. *Farmers H. L. C. & R. Co. v. New Hampshire Real Estate Co.*, 40 Colo. 467; *Stanislaus Water Co. v. Bachman, supra.* In so holding, however, we must be understood as considering only the nature of the contract and the rights of the contract holders, and not the status of ordinary water users.

In conclusion, we believe the views expressed are in accord with the general principles adopted in the western states. In those states, as in this, a stock corporation formed for the purpose of constructing an irrigation canal, though private as to its manner of organization, is of the nature of a public service corporation. Its rights and duties are m fied by the nature of its functions. It cannot serve the public generally, but only the occupiers of land lying under the ditch. Its duties to the respective consumers may be modified and affected by the operation of rights of priority and by the operation of the police powers of the state. *Cummings v. Hyatt*, 54 Neb. 35; *Castle Rock Irrigation Canal & Water Power Co. v. Jurisch*, 67 Neb. 377; *Farmers Canal Co. v. Frank*, 72 Neb. 136; Wiel, Water Rights (2d ed.) secs. 411, 413, 416; Kinney, Irrigation, sec. 307 *et seq.;* Pomeroy (Black's), Water Rights, sec. 194; Long, Irrigation, sec. 130.

The contention that the state of Nebraska has initiated a different system or adopted different principles with respect to the practice of irrigation we think is unfounded. The customs of settlers upon subarid lands in this state and the statutes enacted by the legislature are in most respects the result of the experience of irrigators in, and of laws upon the statute books of, states lying farther west. In these states the legal principles which have been evolved through the experience of more than half a century have been crystalized into statutes varying in administrative details, but alike in fundamentals. The progress of legislation is still going as practical experience shows the necessity of change—witness the several acts on this subject passed by the legislature of 1911. Laws based upon custom and experience, and not upon *a priori* speculation, are usually the wisest that the statute books contain. We take the view that our Nebraska laws should be interpreted in the light of the experience of others under somewhat similar conditions.

The district court found for the plaintiff and the cross-petitioners, that the contracts were valid, and that the preference right and the right of relief from assessments therein contained were binding on the Tri-State Land Company. The decree seems to allow the contract holders to take water at any point on the ditch, and does not seem to protect and reserve sufficiently the right of the Tri-State Land Company or of the state to regulate the use of the headgates so as to prevent waste of water. The contract holders are not entitled to the use of water to their contract quantity irrespective of a beneficial use.

We think the decree of the district court must be affirmed in the main, but modified so as better to preserve these rights.

AFFIRMED AS MODIFIED.