**UNITED STATES v. TILLEY, State Engineer of Nebraska, et al.**

**No. 11587.**

Circuit Court of Appeals, Eighth Circuit.

Dec. 23, 1941.

Rehearing Denied Jan. 28, 1942.

John F. Cotter, of Washington, D. C., Atty., Department of Justice, (Norman M. Littell, Asst. Atty. Gen., Joseph T. Votava, U. S. Atty., of Omaha, Neb., Charles R. Denny and W. Robert Koerner, both of Washington, D. C., Attys., Department of Justice, and William J. Burke, Dist. Counsel, Bureau of Reclamation, of Billings, Mont., on the brief), for appellant.

·Paul F. Good, Sp. Counsel, of Lincoln, Neb. (Walter R. Johnson, Atty. Gen. of

Nebraska, and John L. Riddell, Asst. Atty. Gen. of Nebraska, on the brief), 'for Nebraska irrigation administrative officers, appellees.

Thomas F. Neighbors, of Scottsbluff, Neb. (Lester A. Danielson, of Scottsbluff, Neb., on the brief), for appellee Farmers' Irr. Dist. and others.

William D. Deakins, Jr., of North Platte, Neb., for intervener-appellee Reconstruction Finance Corporation.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

In a suit for an injunction against the administrative officers of the State of Nebraska in charge of the diversion and distribution of its appropriated irrigation waters, and also against the Farmers' Irrigation District of that state, the United States seeks to have it decreed (1) that the appropriative rights claimed by the District to natural flow waters of the North Platte River under the laws of Nebraska, and recognized by the administrative officers of the State in favor of the District, had been transferred to and become vested in the United States under a contract with the District's predecessor in interest, the Tri-State Land Company, dated August 12, 1912; and (2) that the State of Nebraska and its administrative officers have no right to interfere with the collection by the United States of the seepage waters from the irrigation of lands in the Pathfinder division of its North Platte Irrigation Project, and the carriage and re-application of such waste waters to further beneficial use on lands in the Northport division of the same government reclamation project, nor to permit the District to use and to obtain the benefit of such seepage waters as against the United States.

Two wholly separate causes of action and independent legal issues are thus presented. The District Court held that there was no right to an injunction on either cause of action, and the United States has appealed from the dismissal of its action.

As to its first cause of action, the United States contends that the Tri-State Land Company—to whose rights and property the Farmers' Irrigation District had succeeded—had previously assigned and transferred the appropriative rights, which the District claims it acquired from the Company, to the United States, by a contract dated August 12, 1912, in exchange for an agreement by the United States to supply the Company with surplus waters from the storage reservoirs and other available sources in its North Platte Irrigation Project, in an annual amount of 180,000 acre feet, to be released and delivered to the Company in accordance with a prescribed monthly schedule. The appropriative rights of the Company which the United States claims had been assigned to it, in exchange for this regulated storage supply, had an early priority date, in the history of Nebraska water rights, of September 16, 1887, and were considerably in excess of the quantity of water which the United States was to release from its storage sources under the contract schedule; but the flow of the North Platte River was not constant throughout the year, and there were periods during the irrigating season when there was insufficient water to provide for the needs of growing crops on the lands which the Tri-State Land Company's canal had been constructed to serve.

The contract of August 12, 1912, between the United States and the Company was made under the provisions of the Warren Act of 1911, 36 Stat. 925, 43 U.S.C.A. §§ 523–525, which authorized the Secretary of the Interior to contract with distributors of irrigation waters for the impounding, storage, and carriage of water, to the extent of the excess capacity of the facilities of any project constructed under the Reclamation Act of 1902, 32 Stat. 388, 43 U.S.CA. § 372 et seq., not required for the purposes of the lands intended to be reclaimed and irrigated by such project. By the terms of the contract, the Company was to pay the United States the sum of $500,000, and was further to bear one fourth of "the total operation and maintenance charges in connection with the storage works from which said stored water may be supplied".

The position of the Farmers' Irrigation District is that the contract was merely intended to supplement and stabilize the water supply and irrigation service of the Company, and of the District as successor-owner of the canal; that it did not purport to assign or transfer the Company's appropriative rights to the United States; and that it could not in any event enable the United States by injunctive process to

deprive the lands lying under the canal of the benefits of the appropriation.

Turning to the contract itself, its preamble recites, as the reason and basis for the agreement, that the United States had certain surplus storage waters in the Pathfinder Reservoir of its North Platte Irrigation Project available for disposal under the terms of the Warren Act; that the Company had certain appropriative rights in the natural flow waters of the North Platte River which were insufficient for the proper irrigation of the lands intended to be served by its canal; that the Company was desirous of perfecting its water supply by arranging with the Secretary of the Interior for the use of a portion of such surplus storage waters; and that the landowners under the Company's canal, who had organized themselves into the Farmers' Irrigation District and were contemplating "taking over the Company's canal, water appropriation and other like property in connection with the canal" were "desirous of having the Company purchase water to supplement the appropriations already held by the Company in a sufficient quantity for the irrigation of lands included within the District."

This preambulatory recitation, though, of course, not controlling, lends at least some indicative support to the District's contention, as to the intended purpose and effect of the transaction. In addition, Article I of the contract also is confirmatory of the District's position, that the object of the parties was simply to provide the Company with an auxiliary supply of irrigation water, in accordance with the authorization of the Warren Act, and not to attempt to transfer to the United States the title to the appropriative rights which the Company held under the laws of Nebraska. This article provides that the United States will impound and store and release into the North Platte river, and furnish from other sources, for the use of the Company, an amount of water which will, *with all the water the Company may be entitled to by reason of any appropriations* and all water to which the lands of said Irrigation District are entitled" (italics supplied), aggregate a certain scheduled flow, during the period from April 15th to October 15th of each year, amounting to a total of 180,000 acre feet.

The United States, however, places its reliance upon Article XI of the contract, which provides: "The delivery of the water supply provided for in this contract will be accepted by the Company as in full satisfaction of all its rights to the water of the North Platte River, both natural flow and surplus storage from the Pathfinder Reservoir and other Reservoirs of the Reclamation Service constructed in connection with the North Platte Project."

But the language of Article XI can hardly be said to be words of express assignment, for, whatever it may have been intended to accomplish, it does not on its face purport to transfer anything directly to the United States. If it can be argued that there is an implied intention to pass title to the Company's appropriative rights to the United States, such an implication is certainly not a compelling one, in the face of the seemingly opposing recitation in the preamble, and of the nature of the obligation defined in Article I; and, indeed, when the circumstances attending the drafting of the instrument and the actions of the parties under the contract are considered, any such implication would seem to be completely dissolved.

The circumstances surrounding the making of the contract tend to convince us, as they did the trial court, that the parties deliberately omitted any express assignment provision from the final draft of the instrument, because of a doubt as to its legal validity. The record shows that the first draft of the contract submitted by the United States to the Company had contained a provision that "it is agreed that the United States shall hold in trust for the benefit of said Company all claims of the Company to the waters of the North Platte River". In a subsequent draft, this provision was changed to read that, "In order to enable the United States to deliver the supply of water herein specified on the basis of payments as herein provided, the Company hereby assigns to the United States all its right, title, and interest to the waters of the North Platte River over and above the amounts provided in this contract, and limits its claims to such amounts".

The language used in these two preliminary draft provisions is direct and unequivocal. The record indicates that the Company raised no particular objection to either of them, though there is no competent showing that the landowners of the District were willing to consent to a surrender of the beneficial use of any part of the appropriative rights. In any event,

there seems to have been some discussion in the Bureau of Reclamation on whether any attempt to assign the Company's appropriative rights would be valid under the law of Nebraska; and the only testimony in the record that in any way tends to explain the form of the final draft of the contract is contained in the cross-examination of the government's witness Walter, which is supportive of the District's position here.

■ Walter, who was a supervising engineer for the Bureau of Reclamation and had participated in the controlling conferences and negotiations leading up to the execution of the contract, testified, in effect, that it was his recollection that the objection which had been raised to the legality of any assignment of the Company's appropriative rights was responsible for the elimination of the previous assignment provision in the final contract draft. His recollection was perhaps not so absolute that it ought by itself to be accepted as conclusive of the matter, but his frank statement and manifest conviction, that "it was anyhow eliminated", are entitled to consideration in determining whether an express assignment provision was intentionally omitted, and in weighing the significance and interpretation to be given Article XI under the other circumstances of the case, and in the light of the recitations contained in the preamble and in Article I.

■ A further reason why we think the contention of the United States can not reasonably be adopted here is found in the subsequent actions of the parties under the contract, through a long period of years, which seem to us to evidence a recognition and acceptance of the construction for which the District is contending. From 1912 to 1936, when the present controversy first arose, the District, as the Company's successor in interest (and substituted for the Company in the contract of August 12, 1912, by a supplementary contract with the United States), had regularly used the natural flow appropriation as it saw fit, and had merely called upon the United States for a release of storage waters as an auxiliary supply, when there was a shortage in the amount fixed by the contract schedule. At no time during this period is the United States shown to have disputed the District's right to use the natural flow waters as such, or in an amount up to the limit of its claimed appropriative rights in such waters.

The District has acted on the theory and construction that Article XI merely fixed or limited the scope of the obligation of the United States; that its effect was simply to prevent the District from calling upon the United States for water, if the available natural flow under its appropriative rights equaled or exceeded the contract schedule; and that when the District had received the amount of water prescribed by the contract, during the period specified, no matter from what source it was derived, the obligation of the United States was thereby satisfied, under the provisions of Article XI. These actions of the parties over a period of almost twenty-five years are strongly indicative of a mutual interpretation, which necessarily is entitled to weight here in settling a subsequent dispute as to the intended meaning of the contract provision.

It may be added that the provision in the contract for payment of the sum of $500,000 and an annual amount equal to one-fourth of the maintenance costs of the storage works involved further tends to stamp the transaction as one of mere storage or surplus water sale, as the Warren Act specifically authorizes. And, in view of the fact that the final contract was drawn by attorneys in the Reclamation Bureau, after they had previously included in the proposed instrument a form of express assignment, and after a question admittedly had been raised as to the possible invalidity of any attempted assignment, and without any claim here of inadvertent omission or mutual mistake or any request for reformation, the impression naturally and reasonably is created that it probably was desired at the time to avoid entangling the United States in any dispute with the state administrative officers over a recognition of such a transfer, or possibly with the landowners under the canal, and that the assignment provision was for this, or some other equally controlling reason, deliberately omitted. It is, of course, not important here what the actual reason for the omission may have been, and we would not have it appear, in what has been said, that we are attempting to indulge in speculation with respect to it. All that we desire to indicate is that the circumstances convince us that, for some reason, an express assignment provision, in the language of the witness Walter, "was anyhow eliminated."

If Article XI was intended by the United States at the time to have any effect in

preventing the Company and the District from making use of more than 180,000 acre feet of water, it may be that the attorneys for the Bureau of Reclamation assumed that, without a formal assignment or transfer of appropriative rights, Article XI could be made in practical effect to operate as a simple relinquishment to the United States of any excess waters over 180,000 acre feet, which might exist under the Company's appropriative rights, and thereby permit the United States to use such excess waters for other reclamation purposes. Here again we are not seeking to reach a speculative conclusion, but only to point out that, if such was the object of Article XI, it does not so provide in express terms; nor have the parties recognized and interpreted it as having that effect by their conduct during the twenty-five year period preceding this controversy; nor, under the law of appropriative rights, would it in any event entitle the United States to a decree here compelling the state officers to give recognition to any such an attempted relinquishment in favor of the United States, in view of the proved existence of intermediate appropriations. There is no confirmatory evidence in the record of an intended or actual abandonment or relinquishment by the Company or the District of any excess waters over 180,000 acre feet, but, if such an abandonment or relinquishment had actually been made, under the agreement here involved or otherwise, it would not, as we have indicated, enable the United States to claim the waters by injunctive process here, but such waters would automatically have inured to the benefit of other appropriators, with rights superior to those of the United States, in the direct order and to the extent of their appropriative priorities. Neb. Comp.St. 1929, § 46-503.

■ Reading the contract as a whole, and viewing the circumstances accompanying the transaction, and scrutinizing the subsequent interpretative conduct of the parties, as we are privileged to do in a matter of construction (See Restatement, Contracts, § 235), we hold that the United States is not entitled to have it decreed that the appropriative rights of the Tri-State Land Company were assigned and transferred to and became vested in it under the contract of August 12, 1912, and that its request for an injunction on that basis should be denied.

It may be remarked in passing that the Supreme Court of Nebraska also has had occasion incidentally to give consideration to the nature and effect of the contract here involved, in State ex rel. Sorensen v. Mitchell Irrigation District, 129 Neb. 586, 262 N.W. 543, certiorari denied 297 U.S. 723, 56 S.Ct. 667, 80 L.Ed. 1007, in connection with the contention of a junior appropriator, that the Farmers' Irrigation District had lost its right to natural flow water of the North Platte River, to the extent that it had called upon the United States for storage waters under the contract of August 12, 1912. The court's expression in that case is not, of course, an adjudication against the United States, since it was not a party to the proceeding, but the language used is nevertheless of some indicative interest, as an ostensible face construction. The court said at page 550 of 262 N.W.: "The record discloses that, at times during the irrigation season in dry years, there is an insufficient amount of water in the natural flow of the North Platte river to supply cross-petitioner [Farmers' Irrigation District] with the amount of water for which its appropriation has been heretofore adjudicated, and cross-petitioner, for the purpose of supplementing this supply, has contracted with the government for a stipulated amount of water, to be released from the reservoirs, above mentioned, during the irrigation season. Its contract with the government for water stored in the reservoirs was simply a means to supplement its needs in dry seasons."

It should perhaps also be mentioned that the District has urged, as an additional reason why the United States should be denied injunctive relief on its first cause of action, that, even if the Company had attempted to assign its appropriative rights, such a purported assignment could not of itself affect the right of the landowners under the canal to the full beneficial use of the appropriative rights, since the appropriation had been made with specific reference to their lands, and the canal had been constructed for the purpose of serving them; and that they could not therefore be deprived of the beneficial use of any part of such waters, even in excess of 180,000 acre feet, when it was needed upon their lands.

■ By act of the Nebraska legislature, all appropriations for irrigation

purposes made since 1895 are inseparably appurtenant to specific land, and so follow the land to which the water was intended to be and has been applied. Neb.Comp.St. 1929, § 46-109. Appropriative rights acquired prior to 1895, however, were not necessarily required to be attached to specific land, and so could, generally speaking, be transferred or assigned for use on other property. See Vonburg v. Farmers' Irrigation District, 132 Neb. 12, 270 N.W. 835; Enterprise Irrigation District v. Tri-State Land Co., 92 Neb. 121, 138 N.W. 171; Clague v. Tri-State Land Co., 84 Neb. 499, 121 N.W. 570, 133 Am.St.Rep. 637; Enterprise Irrigation District v. Willis, 135 Neb. 827, 284 N.W. 326. But any change in the locational use of previously appropriated waters could, after 1895, only be made "under the permission and subject to the administrative control" of the state irrigation authorities. Farmers' & Merchants' Irrigation Co. v. Gothenburg Water Power & Irrigation Co., 73 Neb. 223, 102 N.W. 487, 488. This prescription for administrative permission to change the locational use was not in any way an impingement upon such previously vested appropriative rights and their inherent incidents, but was a valid exercise of state police power, in safeguarding against the possibility of an unjustifiable waste of public waters and in aiding orderly administration and supervision. Under what conditions the state irrigation authorities might properly refuse to permit such a change in locational use, we need not consider. Nor are we concerned here with whether the locational change that was contemplated in this case by the United States was one which the state irrigation authorities would have been required to approve, if there had been in fact an actual assignment of the Company's rights under the provisions of the contract, and if there were no other interests affected or involved.

■■ It is only necessary to point out now—and we do so primarily in the public interest, because the contention has been presented, and since an expression may serve to clarify the status of the District's appropriative rights in their relation to the landowners under the canal, not only in the present controversy but for the future— that, while appropriative rights which became vested in Nebraska prior to 1895 are subject to transfer as ordinary property, and generally speaking to a change in locational use with the permission of the state irrigation authorities, such a right of change in locational use has always been subject to qualification in the case of a canal company, organized to carry and distribute irrigation water, which has made an appropriation for the purpose of serving particular lands, and has caused its appropriative waters to be thus applied. In such a situation, the rights of the canal company with respect to the waters appropriated, though acquired prior to 1895, have become dedicated to the use of the lands which the canal was constructed to serve and to which such waters have been applied; and the canal company cannot deprive the landowners of the continuing benefit of this dedicated use without their express consent.

■ Such a canal company is "of the nature of a public service corporation". Fenton v. Tri-State Land Co., 89 Neb. 479, 131 N.W. 1038, 1043. "Its rights and duties are modified by the nature of its functions. It cannot serve the public generally, but only the occupiers of land lying under the ditch." Page 1043 of 131 N.W. As a quasi public service corporation, it was allowed to exercise the sovereign privilege of eminent domain. Neb. Laws of 1877, p. 168, § 1. "The law grants to corporations of this character valuable rights, but with these rights are accompanying duties to the landholders for the irrigation of whose land the rights are granted, and, if these obligations are not fulfilled, the law will interfere at the request of the party injured." Farmers' Irrigation District v. Frank, 72 Neb. 136, 100 N.W. 286, 293.

In fact, in the first statute enacted by the Nebraska legislature regulative of irrigation waters in that state, it was specifically provided that "the owners or cultivators of said land along the line of and covered by said ditch or canal, are entitled to and have the right to the use of water from said ditch or canal, for the purpose of irrigating said land, so owned or cultivated in the following order: * * *". Neb. Laws of 1889, Ch. 68, Neb.Comp.St. 1893, Ch. 93a, Art.2, § 13. And the Supreme Court of Nebraska, in Farmers' Irrigation District v. Frank, 72 Neb. 136, 100 N.W. 286, 293, 294, has, it seems to us, clearly recognized the implied right of the landowners under the very canal here involved, to the permanent beneficial use of the appropriative waters now in litigation, by refusing to allow a second appropriation to be made for the benefit of such lands. It is true that in Farmers' & Merchants' Irrigation Co. v. Gothenburg

Water Power & Irrigation Co., 73 Neb. 223, 102 N.W. 487, it was held that a canal company, which had extended its ditch prior to 1895, could validly make such a change and properly serve the lands lying under the ditch extension; but that case involved only excess waters, so far as irrigation use was concerned, which were within the company's original appropriation, but which had not previously been applied for irrigation purposes and were apparently not needed to serve the lands along the original canal, and hence no question of deprivation of beneficial use as against such landowners was involved. There is accordingly no conflict in that decision.

It follows from what has been said that, even if there had been a formal assignment of the Tri-State Land Company's appropriative rights in the contract of August 12, 1912, which might have passed the legal title to the appropriative rights as such, this would not have operated to deprive the lands under the canal of the right to the beneficial use of the appropriated waters which had been applied to and were needed upon such lands, or to enable the United States by virtue of such an assignment alone to make a change in the locational use of such waters; and hence it could not furnish the basis for an injunction to achieve that result, such as is here sought to be done.

For each of the reasons discussed, the United States was not entitled to injunctive relief on its first cause of action, and the judgment of the trial court in dismissing that cause of action should be affirmed.

On the United States' second cause of action, the controlling question is whether, under the law of Nebraska, seepage waters from lands under an irrigation project or canal, which, if not intercepted, would ultimately, by percolation or drainage, return, in part at least, to the river from which they were diverted, may be collected by the appropriator, in drains or ditches upon such lands, and be applied to further beneficial use upon other lands under such project or canal; or whether, when appropriated waters have once been applied to any lands under an irrigation project or canal, the appropriative rights therein have been exhausted, so that the seepage waters resulting from such irrigation use are not susceptible of recapture by the appropriator, but must be allowed to return as fully as possible to the natural stream, and are to be regarded wholly as public waters, subject to administration by the state irrigation authorities.

This Court has previously expressed itself upon the basic aspect of the question under Nebraska law, in Ramshorn Ditch Co. v. United States, 8 Cir., 269 F. 80. In its application to the present situation, the purport of the expression in that case is that it is our interpretation of the law of Nebraska governing appropriative rights that an appropriator of public waters for use under an irrigation project or canal is entitled to collect seepage waters upon any part of the lands under such project or canal, by means of drains or ditches, and to apply them to further beneficial use upon any of the lands under such project or canal. Incidentally, the controversy in that case arose out of the same reclamation project as here, and involved the right to the use of seepage waters in one of the very drains now under consideration.

The view taken of the Nebraska law in the Ramshorn case is in accord with that declared by a majority of the courts, under general appropriation statutes, as the law seems to have developed in that field up to the present time. See Ide v. United States, 263 U.S. 497, 44 S.Ct. 182, 68 L.Ed. 407; 2 Kinney on Irrigation and Water Rights, 2d ed., 2189, §§ 1207–1208; 30 Am.Jur. 611, 618; 89 A.L.R. 200, 215, 218, annotation. The courts of some states, notably Colorado, have adopted a contrary view, but the cases of Ft. Morgan Reservoir & Irrigation Co. v. McCune, 71 Colo. 256, 206 P. 393, and Comstock v. Ramsay, 55 Colo. 244, 133 P. 1107, upon which the Colorado rule rests, appear to have been the subject of considerable dispute even within that state.

It is, of course, now generally recognized that, in the absence of extreme soil or climatic conditions, seepage waters within a watershed, if present in a sufficient quantity and for a sufficiently continuous period, will ordinarily ultimately find their way back in part to the diversion stream. Whether, in the light of this natural fact, which appears not to have been comprehended in the early development of irrigation law, the public interest of an arid state would be better served by permitting the recapture of seepage waters upon the lands irrigated and their further application to beneficial use by an irrigation project or canal appropriator, or in requiring that all such waters be treated as wholly tributary to the natural stream, is, however, not the

question here. That point we necessarily have no right to determine for the people of Nebraska. Our duty, as a federal court, is simply to ascertain the existing law of the state, as accurately as we are able, and to apply it as we find it to be. Yoder v. Nu-Enamel Corporation, 8 Cir., 117 F.2d 488. If any grave doubt should exist in our mind as to the law of the state on a question of such public importance[1] as is here involved, it would be our duty to deny an injunction in the present case, since "our process does not issue unless the path is clear". Hawks v. Hamill, 288 U.S. 52, 61, 53 S.Ct. 240, 243, 77 L.Ed. 610.

But, the declaration in the Ramshorn case as to the law of Nebraska, on the right of an appropriator to recapture seepage waters, has apparently stood unchallenged by any expression on the part of either the courts or the legislature of that State for more than twenty-one years. It represents, as we have indicated, the majority rule and construction in the field of general irrigation law. In addition, the Supreme Court of Nebraska, by indicative expression, seems to us to have given confirmation to the view that it is the intention of the law of that State to grant to an appropriator the fullest possible beneficial use of the waters of his appropriation. Thus, in Farmers' Irrigation District v. Frank, 72 Neb. 136, 100 N.W. 286, 294, the court, in discussing appropriative rights in connection with an irrigation canal, said: "The person making the first application for the use of water to water any particular tract of land is given by the law an exclusive right to the water, so long as he applies it to the beneficial use, and is granted, therefore, in a certain sense, a monopoly of the use of the water which he has been allowed to appropriate."

Appellees urge upon us that, at the time the controversy in the Ramshorn case originated in the District Court, there was in effect a special Nebraska statute authorizing an appropriator to recapture seepage waters, as a matter of legislative permission,[2] and that this statute ought to be regarded as the real basis for our injunction in that case. But this argument ignores the fact that the opinion expressly declared that the right of an appropriator, under Nebraska law, to recapture seepage waters upon the lands under an irrigation project or canal, did not depend upon this special statute. 269 F. at page 83. Further than this, at the time the Ramshorn case was disposed of in this Court, the special statute referred to had been repealed;[3] and, while the opinion apparently failed to take cognizance of this fact and treated the statute as an alternative ground of decision, it is clear that, if the right to recapture seepage waters under an irrigation project could only have rested upon legislative permission under this special statute, the repeal of the statute would have left no valid basis to sustain the injunction in that case, or for the acceptance by the parties, including the state administrative officers who were defendants in the action, of the decree of this Court.

We do not have any actual means of knowing why, in adopting a Civil Administrative Code for Nebraska in 1919, the legislature repealed this special statute. The fact, however, that there has been no challenging expression on the part of the legislature or the courts of Nebraska, during the twenty-one years that have elapsed since the Ramshorn decision, would seem logically to indicate a recognition and acceptance of the correctness of the declaration in that case, that the special statute had added nothing to the already existing rights, under the irrigation statutes of 1895 (Neb. Laws of 1895, Ch. 69), of an appropriator to recapture the seepage waters under an irrigation project or canal, and reasonably to suggest that, in the rewriting or compiling of the statutes in-

[1] The Constitution of Nebraska, Art. XV, § 4, expressly provides that "The necessity of water for domestic use and for irrigation purposes in the State of Nebraska is hereby declared to be a natural want." Section 6 of the same Article further provides that "The right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest."

[2] Neb.Rev.St.1913, § 3426: "Any person, persons, district, company or corporation owning, constructing or operat-

ing an irrigation canal in this state, are hereby authorized to collect or assist to collect any seepage water thereunder or under any adjacent irrigation canal by the construction of drainage ditches and to apply said waters to irrigate with on the lands covered by the original appropriation of such canal. while said seepage waters are being conducted by said drainage ditches toward the natural streams. * * *"

[3] Repealed by Neb.Laws of 1919, p. 864.

corporated in the Civil Administrative Code, legislative accord with that view in all probability prompted the repeal of this special statute. But, however that may be, in the absence of anything creating a doubt in our mind as to the correctness or soundness of the Ramshorn case, we manifestly owe the duty, under the circumstances to which we have referred above and as a matter of judicial consistency, of following that decision. It may be added that section 46-132, Neb.Comp.St. 1929, authorizing and requiring an irrigation district to make provision for the drainage of seeped lands, seems to us by strong implication further to confirm a legislative recognition of the general right of an appropriator in Nebraska to recapture and re-use seepage waters, when it declares that an irrigation district, in the drainage of such seeped lands, "shall have the right to extend such drainage ditches outside of the limits of such district *for the purpose of conducting the drainage water to other lands upon which the same may be lawfully used* or to return the same to the stream from which its canal is taken". (Italics supplied.)

Several arguments are made to try to escape the effect and application of the Ramshorn decision, but we do not regard any of these as controlling. It is contended, for instance, that the right to recapture seepage waters ought to be held to be impliedly denied by section 46-620, Neb.Comp.St.1929, which provides: "The owner or owners of any irrigation ditch or canal shall carefully maintain the embankments thereof so as to prevent waste therefrom, and shall return the unused water from such ditch or canal with as little waste thereof as possible to the stream from which such water was taken, or to the Missouri river". This section was contained in the statutes of Nebraska at the time the Ramshorn case was decided, and it does not in any way conflict with the views and expressions in that opinion. It has application to the conservation and return of the unused waters of an irrigation ditch or canal, but it does not purport to limit or define the scope of the use or re-use of the waters properly withdrawn from the ditch or the canal for beneficial application. Such appears also to have been the force given it, in Osterman v. Central Nebraska Public Power & Irriga-

tion District, 131 Neb. 356, 268 N.W. 334, 340, cited by appellees, where, in holding that an appropriation could not be made for application upon lands located outside the basin or watershed of a stream, the court said: "In fact, section 46-620 was in effect a substantial re-enactment of section 6, art. 1, Laws 1889,[4] because it is inconceivable that its prohibitions would ever be applied to any but unused waters." Furthermore, the attempt to give section 46-620 the construction for which appellees contend would nullify the implication of the express language of section 46-132, to which reference has been made above.

It is further contended that the Ramshorn case and Ide v. United States, 263 U.S. 497, 44 S.Ct. 182, 68 L.Ed. 407, where the same rule was applied under Wyoming law, ought not to be followed in the present situation, in view of the declaration in the subsequent case of Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525, that, in any project under the Reclamation Act, the United States is simply a carrier and distributor of the appropriated waters and that the landowners are the actual owners of the water rights. This, however, is a mere restatement of the provision in the Reclamation Act, 32 Stat. 390, 43 U.S.C.A. § 372, that "The right to the use of water acquired under the provisions of the reclamation law shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right". This statutory provision also was in effect at the time of the decisions in the Ramshorn and Ide cases, and Ickes v. Fox neither conflicts with, nor contains any modification of, the rule which they announce.

Further than this, under the law of Nebraska, and without reference to the Reclamation Act or Ickes v. Fox, supra, all appropriations made in that state since 1895 have always been inseparably appurtenant to the land for which the appropriation was made and to which the water is applied. The appropriation of the United States here involved was made in 1904. At all times since 1895, there has been on the statute books of Nebraska an equivalent provision to that which is now contained in section 46-109, Comp.St.1929: "It is hereby expressly provided that all water distributed for irrigation purposes shall attach

---

4 Neb.Laws of 1889, Ch. 68, Art. 1, § 6, provided: "The water appropriated from a river or stream shall not be turned or permitted to run into the waters or channel of any other river or stream than that from which it is taken or appropriated."

to and follow the tract of land to which it is applied." Hence, the right of the United States under the law of Nebraska to recapture the seepage waters from a reclamation project, as declared in the Ramshorn case, has never rested upon the premise that the United States was the actual owner of the waters appropriated and diverted. In Nebraska, as a matter of fact, neither the appropriators for an irrigation project or canal nor the owners of the lands served thereby have title to the diverted waters. Ownership of public waters in that state at all times remains in the public, and "it is the use thereof only that may be appropriated". State ex rel. Cary v. Cochran, 138 Neb. 163, 292 N.W. 239, 247.

In the sense that the right to the beneficial use of such waters attaches to and follows the lands under the project or canal to which application is made, the appropriative rights may be said to belong to the landowners. This right to the beneficial use on the part of a landowner is, therefore, in the nature of a vested right. But the owner of the irrigation project or canal also has an interest in such appropriative rights, by virtue of the fact that the statute permits him to make the appropriation and diversion, that the maintenance of such appropriative rights is necessary in accomplishing the purpose of the project or canal, and that the law imposes certain duties and obligations upon him in the carriage, distribution, and conservation of the diverted waters. This interest clearly is such as to entitle him to take any necessary steps to protect the scope of the rights conferred by the state appropriation statutes, not merely in representatively securing and protecting the full measure of beneficial use for the landowners under the project or canal, but also in effectuating generally the object of the project or canal as an enterprise.

The argument is made that since the United States has divided the reclamation project here involved into several divisions, which have been completed at different times, the seepage waters from the lands in one division ought not in any event to be permitted to be recaptured for use upon the lands of another division. It appears that the lands in Nebraska lying under the reclamation project—the project itself covering lands in both Wyoming and Nebraska—have been permitted to be organized into public corporations under the laws of Nebraska, known as the Pathfinder Irrigation District, the Gering-Ft. Laramie Irrigation District, and the Northport Irrigation District, and that the United States has turned over to each of such Districts the operation of the canal and laterals for the irrigation of the lands therein. The seepage waters here in question come from the lands in the Pathfinder Irrigation District, while the lands to which the United States seeks to have them applied are located in the Northport Irrigation District. The Districts, however, are contiguous and the grouping of the lands into such divisions is simply a matter of mechanical organization and administrative convenience, in the sound development of the project as a whole. The reservoirs and diversion works, by means of which the waters are supplied, remain in the control of the United States.

The contention that each District or division should be treated as a separate unit in determining the scope of the rights in the waters applied to the lands under the project rests upon a provincial view as to the real nature and object of a reclamation project, and it fails to take into account the fact that the State has itself recognized the unity and integration of the project by making possible and allowing a single appropriation to be made for the benefit of all the lands thereunder.

The fact that the Northport division of the project was not completed until several years after the other two divisions is not of any significance on the question here involved, since the State has at no time attempted to claim that the benefits of the original appropriation became lost to the lands in the Northport division, by the delay and as a matter of legal abandonment.

It necessarily follows from what has been said that the scope of the appropriative rights in connection with a federal reclamation project must be regarded as being the same, under the law of Nebraska, as those in connection with any irrigation canal, and that this includes the right, by proper means, to collect seepage waters from any part of the lands, and to reapply them upon other lands within the project and under the appropriation. Here, the drains involved were developed for the express purpose of collecting and removing the seepage. The right to the use of seepage waters is not affected by the size or area of the land covered by the appropriation, where the state irriga-

tion authorities have approved the making of the appropriation for the lands as a body. In fact, the right to the use of such waters is probably of far greater importance in accomplishing the purpose of a general reclamation project, such as is here involved, than in merely carrying on the commercial operations of an ordinary irrigation canal.

All these facts seem to us to have been impliedly recognized by the Nebraska legislature in the provision of section 46-628, Neb.Comp.St.1929 (first enacted, in substantially similar form in 1911, Neb.Laws of 1911, Ch. 151), that "The United States of America is hereby authorized, in conformity to the laws of the State of Nebraska, to appropriate, develop and store any unappropriated, flood or unused waters, *in connection with any project constructed by the United States* pursuant to the provisions of an act of congress approved June 17, 1902, being an act providing for the reclamation of arid lands (32 Stat. L.388), and all acts amendatory thereof and supplemental thereto. * * *" (Italics supplied.) This language certainly evidences no intention to restrict in any respect the scope of the rights that might be acquired by the United States under a general appropriation, but rather, in a hospitable spirit, to give the fullest recognition to such rights and to their free use in the development and accomplishment of the purpose of the reclamation project. As to appropriative rights acquired by the United States prior to 1911, with the approval of the state irrigation authorities, the statute would similarly have the effect of ratifying and confirming the scope of such rights. We think, therefore, that it was the intention of the Nebraska law to allow the United States to have the benefit of all the incidents of its general appropriation, in their application to all the lands of the reclamation project as a whole.

The rights thus acquired by the United States under a valid appropriation necessarily could not be impinged upon, in their basic scope, by administrative regulation or practice, such as was attempted here by the state administrative officers, since the Supreme Court of Nebraska has expressly declared that the administrative officers of the state, in regulating and controlling irrigation, perform ministerial duties only and must give full recognition to the vested rights of all appropriators. State ex rel. Cary v. Cochran, 138 Neb. 163, 292 N.W. 239, 241, 244. "The quasi-judicial powers conferred upon the department have application only to the granting and cancellation of appropriation rights and priorities." Page 244 of 292 N.W.

Since the seepage involved was water which, under the views herein expressed, the United States was entitled to re-use upon the lands in the Northport division of its reclamation project, it necessarily was water which the Farmers' Irrigation District, under its contract of carriage with the United States, was required to carry in its canal to the Northport canal, and which the state administrative officers could not exonerate it from so carrying, by purporting to authorize the water to be diverted and used upon the lands in the Farmers' Irrigation District, as an optional diversion of public waters, in exchange for part of the natural flow water in the North Platte River to which it would otherwise be entitled under its appropriative rights. The record satisfies us that there is no problem of particular administrative difficulty involved in the admeasurement of these seepage waters for carriage purposes.

The contention is made that the United States has been guilty of making out-of-priority diversions of natural flow waters from the North Platte River, in connection with its storage and diversion works, during the period that the state administrative officers have permitted the Farmers' Irrigation District to make optional diversions of the seepage waters from the reclamation project, and that, for this reason, injunctive relief should be denied here. These diversions were made in the State of Wyoming, where the reservoirs and dams that constitute the principal works of the reclamation project are located. The question whether appropriations from the North Platte River in Wyoming are subordinate to earlier appropriations from the same stream in Nebraska is apparently an issue in the case of Nebraska v. Wyoming and Colorado, now pending as an original action in the Supreme Court of the United States, in which the United States is an intervener. The legal controversy there involved will not under the circumstances be made the subject of consideration or indirect resolution here. If it can be satisfactorily established that improper diversions are being made by the United States, which are wholly outside

the scope of the questions presented in that case, the inequitable result of such diversions, in the present situation, upon the Farmers' Irrigation District, or in the administration of other general appropriations in Nebraska, would seem to be sufficiently controllable by the trial court through conditions imposed in the granting of the injunction to which the United States is here entitled.

We should state that we have delayed the decision of this appeal until final disposition of the case of Drainage District No. 1 v. Suburban Irrigation District, 298 N.W. 131, by the Supreme Court of Nebraska, in which the motion for rehearing has only recently been denied. We have done so, thinking that the opinion in that case might possibly settle the general question of seepage water rights in Nebraska. The court there has held that seepage waters, drained by means of ditches from lands which, in a state of nature, were too wet to farm, and over which surface waters were diffused, and through which subterranean waters percolated, are not public waters subject to appropriation or to administration by the state irrigation authorities for optional diversion purposes; but it did not attempt or purport to pass upon the question in its relation to seepage waters derived from the application of irrigation waters.

There is, however, nothing in the opinion in that case that in any way conflicts with the declaration in the Ramshorn case, or that raises the slightest doubt as to the correctness of the views there expressed. In fact, the court's decision is expressly predicated upon the premise that only the waters of natural streams are public waters—a premise which also is the foundation of the decision in the Ramshorn and Ide cases. The opinion further applicably declares (298 N.W. at page 136): "The drainage ditches of plaintiff are strictly artificial creations. * * * These drainage ditches are not natural streams or natural water courses, and their inherent nature exclude them from the class or kind of waters to which our laws of appropriation are now applicable."

In nothing that has been said is it intended to challenge in any way the optional diversion practice adopted by the state administrative officials, but we are merely holding that such officers could not deprive the United States of the right to re-use the seepage waters here involved, under its appropriative rights, by an optional diversion practice or otherwise.

For the reasons which have been discussed above, the judgment of the District Court on the United States' first cause of action is affirmed, and the judgment on the second cause of action is reversed.

On Petition for Rehearing.

In a petition for rehearing, appellees earnestly argue that the acts of the United States in making certain diversions out of the North Platte River, under a Wyoming appropriation, ought to have been held to constitute such inequitable conduct, in their relation to prior appropriations in Nebraska, that the United States should in no event have been permitted to seek injunctive protection here of its right to use the seepage waters from the lands under its reclamation project in Nebraska, because of unclean hands and lack of equitable standing.

On the record before us, we could not fairly make any other disposition of that contention than has been done in our previous opinion. The priority conflict between Nebraska and Wyoming appropriations from the North Platte River is, as we have indicated, one of the questions involved in the case of Nebraska vs. Wyoming and Colorado, pending as an original action in the Supreme Court of the United States, in which the United States is an intervener. The complexity of the controversy in that case has apparently necessitated the taking of evidence before a special master for a period of several years, and, according to the statement of counsel here, the briefing which is required will make it impossible to submit the cause to the Supreme Court before the October term, 1943.

The District Court on the trial of this case took the position that none of the issues in that controversy should, under the circumstances of the situation, be permitted to be made the subject of trial or resolution here, and counsel for all parties, on the record before us, must be held to have acquiesced in this elimination. Appellees were, however, permitted to show by one of their witnesses that the United States had made diversions in Wyoming, which had operated prejudicially to prior appropriators in Nebraska, and a summary of this testimony was incorporated in one of the trial court's findings. It is on the basis of this testimony that we are now asked to declare that the United States has

been guilty of inequitable conduct which should deprive it of all standing in this case.

No attempt has been made in the record and the briefs to develop the legal relationships involved in the priority conflicts between appropriations from the North Platte River made under Nebraska and Wyoming law, so that, if we were to ignore the trial court's initial limitation on the questions to be considered and the acquiescence of counsel therein, we would still be unable to reach the conclusion for which appellees contend, without blindly closing our eyes to the possible existence of other relevant facts and to a consideration of the legal positions underlying the conflicts over appropriation priorities between the two states. A court of equity would hardly, in a situation of such public importance, undertake thus casually to deny a suitor's equitable standing—if indeed the equitable maxim which appellees seek to invoke can at all be regarded as having application in the present case, in view of the nature of the rights involved and the parties affected by the result.

On the record before us, we find no merit in either this or any of appellees' other contentions in the petition for rehearing, and the petition is accordingly denied.